AMERICAN FAMILY MUTUAL INSURANCE COMPANY,
Plaintiff-Appellant-Cross-Respondent,†

v.

AMERICAN GIRL, INC., f/k/a Pleasant Company, Inc.
Defendant-Respondent-Cross-Appellant-
Petitioner,

The RENSCHLER COMPANY, INC., Defendant-Third-
Party Plaintiff-Respondent-Cross-Appellant-
Petitioner,

v.

WEST AMERICAN INSURANCE COMPANY, The Ohio
Casualty Insurance Company, Regent Insurance
Company and General Casualty Company of Wis-
consin, Third-Party Defendants-Respondents-
Cross-Respondents.

Supreme Court

*No. 01–1871. Oral argument September 9, 2003.—Decided
January 9, 2004.*

2004 WI 2

(Also reported in 673 N.W.2d 65.)

† Motion For Reconsideration denied 3-23-04.

16

For the defendant-third-party plaintiff-respondent-cross-appellant-petitioner there were briefs by *Robert J. Kay, Robert A. Mich, Jr.* and *Kay & Andersen, S.C.,*

Madison, and *Jeffrey W. Younger, Paul W. Schwarzen-bart* and *Lee, Kilkelly, Paulson & Younger, S.C.*, Madison, and oral argument by *Paul W. Schwarzenbart.*

For the defendant-respondent-cross-appellant-petitioner there were briefs by *Michael G. Laskis, Michael B. Van Sicklen* and *Foley & Lardner,* Madison, and oral argument by *Michael G. Laskis.*

For the plaintiff-appellant-cross-respondent there were briefs by *Wayne M. Yankala* and *Mingo & Yankala, S.C.,* Milwaukee, and oral argument by *Wayne M. Yankala.*

For the third-party defendants-respondents-cross-respondents, West American Insurance Company and The Ohio Casualty Insurance Company, there was a brief by *Michael D. Lawrynk* and *Gabert, Williams, Konz & Lawrynk,* Appleton, and oral argument by *Michael D. Lawrynk.*

For the third-party defendants-respondents-cross-respondents, Regent Insurance Company and General Casualty Company of Wisconsin, there were briefs by *Robert F. Johnson, Lee Anne N. Conta, Colleen M. Fleming* and *Cook & Franke S.C.,* Milwaukee, and oral argument by *Lee Anne N. Conta.*

An amicus curiae brief was filed by *Thomas J. Misfeldt, Christine A. Gimber* and *Weld, Riley, Prenn & Ricci, S.C.,* Eau Claire, on behalf of Civil Trial Counsel of Wisconsin.

An amicus curiae brief was filed by *David A. Krutz, Dereck R. Brower* and *Michael Best & Friedrich LLP,* Waukesha, on behalf of The American Subcontractors Association, Inc.

An amicus curiae brief was filed by *William E. McCardell* and *DeWitt Ross & Stevens S.C.,* Madison, and *Teresa Mueller,* Madison, on behalf of Associated

General Contractors of Wisconsin, Inc., Associated General Contractors of Greater Milwaukee, and Allied Construction Employers Association.

¶ 1. DIANE S. SYKES, J. This insurance coverage dispute presents an array of legal issues pertaining to the proper interpretation of coverage and exclusion language in several post-1986 commercial general liability ("CGL") and excess insurance policies.

¶ 2. The dispute initially focuses on the meaning of "property damage" and "occurrence" in the standard CGL insuring agreement's grant of coverage. The parties also dispute the applicability of several exclusions: for "expected or intended" losses; "contractually-assumed liability"; and certain "business risks" (a/k/a "your work" or "your product" exclusions). There is a question about the applicability of the "professional services liability" exclusion in certain excess policies. Finally, the parties dispute the effect of the economic loss doctrine on the availability of insurance coverage, as well as the application of the common law "known loss" doctrine to certain of the policies.

¶ 3. The factual context is a construction project gone awry: a soil engineering subcontractor gave faulty site-preparation advice to a general contractor in connection with the construction of a warehouse. As a result, there was excessive settlement of the soil after the building was completed, causing the building's foundation to sink. This caused the rest of the structure to buckle and crack. Ultimately, the building was declared unsafe and had to be torn down.

¶ 4. The general contractor, potentially liable to the building owner under certain contractual warranties, notified its insurance carriers of the loss. Contractually-required arbitration between the owner

and the contractor was initiated and stayed pending resolution of coverage questions involving several of the contractor's insurers. The circuit court, on summary judgment, found coverage under some but not all of the policies. The court of appeals reversed, concluding that the "contractual liability" exclusion in each of the policies excluded coverage.[1] We reverse.

¶ 5. The threshold question is whether the claim at issue here is for "property damage" caused by an "occurrence" within the meaning of the CGL policies' general grant of coverage. We hold that it is. The CGL policies define "property damage" as "physical injury to tangible property." The sinking, buckling, and cracking of the warehouse was plainly "physical injury to tangible property." An "occurrence" is defined as "an accident, including continuous or repeated exposure to substantially the same general harmful condition." The damage to the warehouse was caused by substantial soil settlement underneath the completed building, which occurred because of the faulty site-preparation advice of the soil engineering subcontractor. It was accidental, not intentional or anticipated, and it involved the "continuous or repeated exposure" to the "same general harmful condition." Accordingly, there was "property damage" caused by an "occurrence" within the meaning of the CGL policies.

¶ 6. We also conclude that the economic loss doctrine does not preclude coverage. The economic loss doctrine generally operates to confine contracting parties to contract rather than tort remedies for recovery of purely economic losses associated with the contract relationship. The doctrine does not determine insur-

---

[1] *American Family Mut. Ins. Co. v. Pleasant Co.*, 2002 WI App 229, 257 Wis. 2d 771, 652 N.W.2d 123.

ance coverage, which turns on the policy language. That the property damage at issue here is actionable in contract but not in tort does not make it "non-accidental" or otherwise remove it from the CGL's definition of "occurrence."

¶ 7. We further hold that because the property damage at issue here was neither expected nor intended, the "expected or intended" exclusion does not apply.

¶ 8. The "contractually-assumed liability" exclusion (upon which the court of appeals rested its no-coverage conclusion) eliminates coverage for damages the insured is obligated to pay "by reason of the assumption of liability in a contract or agreement." We conclude that this language does not exclude coverage for all breach of contract liability. Rather, it excludes coverage for liability that arises because the insured has contractually assumed the liability of another, as in an indemnification or hold harmless agreement. There is no indemnification or hold harmless agreement at issue here, so this exclusion does not apply.

¶ 9. We also conclude that while the "business risk" or "your work" exclusions ordinarily would operate to exclude coverage under the circumstances of this case, the "subcontractor" exception applies here. The subcontractor exception to the business risk exclusion restores coverage if "the work out of which the damage arises" was performed by a subcontractor.

¶ 10. In addition, we conclude that the "professional services liability" exclusion in the excess policies applies under the circumstances of this case. And finally, coverage under the policies issued after the property damage loss was substantially known to the parties is barred by the "known loss" doctrine.

27

## I. FACTS AND PROCEDURAL HISTORY

¶ 11. In 1994 The Pleasant Company ("Pleasant") entered into a contract with The Renschler Company for the design and construction of a large distribution center warehouse, dubbed the "94DC," on Pleasant's Middleton, Wisconsin, campus. Under the terms of the contract, Renschler warranted to Pleasant that the design and structural components of the 94DC would be free from defects, and that Renschler would be liable for any consequential damages caused by any such defects. (Pleasant changed its name to American Girl, Inc., several days before the issuance of this opinion; we will refer to the company as it was known throughout these proceedings.)

¶ 12. Renschler hired Clifton E.R. Lawson (Lawson), a soils engineer, to conduct an analysis of soil conditions at the site. Lawson concluded that the soil conditions were poor and recommended "rolling surcharging" to prepare the site for construction. Surcharging is a process by which soils are compressed to achieve the density required to support the weight of a building or other structure. The process usually involves placing large quantities of earth above the soil and allowing the earth to bear down on the soils. Typically this requires bringing in enough earth to cover the entire site, which can be very costly, and so for large projects like the 94DC, small areas of the site are compressed individually, and the earth is rolled from one area to the next.

¶ 13. The surcharging was done according to Lawson's professional advice, and the building was substantially completed in August 1994. Pleasant took occupancy, and soon thereafter the 94DC began to sink. By the spring of 1995 the settlement at one end of the structure had reached eight inches.

28

¶ 14. Renschler became aware of the problem in March 1995, and Lawson was subsequently advised. In the fall of 1995 Renschler re-hung approximately 30 exterior panels and windows that were leaking as a result of the settlement. The building continued to sink throughout 1996. By early 1997, the settlement approached one foot, the building was buckling, steel supports were deformed, the floor was cracking, and sewer lines had shifted. In January or February 1997, the parties met to discuss the settlement damage and the options for remediation.[2] In August 1997 Renschler notified its liability insurance carrier, American Family Mutual Insurance Company.

¶ 15. American Family conducted an investigation of the claim and at first concluded that coverage existed for the claim. In January 1998 the insurer reserved $750,000 for the claim, and in May 1998 paid Renschler $27,501 for services performed relating to remediation of the damage that had occurred up to that point. In early 1999 remediation alternatives were estimated to cost between $4.1 and $5.9 million.

¶ 16. Renschler hired engineers to conduct evaluations of the floor from March through September 1999. The engineers advised Renschler that the structural steel was so over-stressed that the building was no longer safe for occupancy. In late 1999 or early 2000 the building was dismantled. By that time, the settlement was approximately 18 inches. Renschler's geotechnical expert concluded that Lawson was negligent in the performance of his engineering/geotechnical work. It is

---

[2] The circuit court concluded that this meeting triggered the application of the known loss doctrine, and we agree. *See,* Part IIIF, *infra.*

29

undisputed that Lawson's faulty soil engineering advice was a substantial factor in causing the settlement of the 94DC.[3]

¶ 17. The contract between Pleasant and Renschler provided for arbitration of disputes. Pleasant filed a demand for arbitration in December 1999 asserting breach of contract and negligence theories of recovery. Pleasant alleged that Lawson's negligence caused excessive settlement, resulting in damage to the building, and that Renschler thereby breached its contract with Pleasant.

¶ 18. In March 2000 American Family filed this action in Dane County Circuit Court seeking a declaratory judgment regarding coverage under the CGL and excess policies it had issued to Renschler from March 1993 to March 1997. Renschler joined four additional insurers: Ohio Casualty Insurance Company and West American Insurance Company, which had issued CGL and excess liability policies for April 1, 1997, through April 1, 1999, respectively, and General Casualty Insurance Company and Regent Insurance Company, which had issued CGL and umbrella liability policies thereafter. Arbitration was stayed pending resolution of the coverage issues.

¶ 19. Cross-motions for summary judgment were filed. The Honorable John C. Albert concluded that American Family's CGL policies for the years 1994–95,

---

[3] While it is undisputed that Lawson's negligent soil engineering advice was a substantial factor in causing the property damage, thus triggering the subcontractor exception to the business risk exclusion (*see* Part IIIE, *infra*), it may or may not have been the only factor. Any outstanding questions regarding the comparative fault of Renschler, Lawson, or Renschler's other subcontractors will be resolved in the arbitration, and do not affect the determination of coverage.

1995–96, and 1996–97 provided coverage, but its 1993–94 policy did not, as it pre-dated the loss.

¶ 20. The circuit court held that Pleasant's claim against Renschler was covered under the language of the insuring agreement in the 1994–97 policies, and that none of the policy exclusions applied. The court also concluded that neither the economic loss doctrine nor the known loss doctrines precluded coverage under these policies. The circuit court also concluded that the "professional services liability" exclusions in American Family's excess policies excluded coverage under those policies. With respect to the four other insurers, the circuit court held that the known loss doctrine precluded coverage, because the extent of the settlement problem was known before any of those policies came into effect.

¶ 21. The court of appeals reversed as to American Family's CGL base policies for the years 1994–97. Relying on its decision in *Nelson v. Motor Tech, Inc.,* 158 Wis. 2d 647, 462 N.W.2d 903 (Ct. App. 1990), the court held that the exclusion for property damage "for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement" precluded coverage, because Renschler's liability to Pleasant derived entirely from its obligations under the construction contract. *Id.* at 650. The court of appeals also held that there was no coverage under American Family's excess policies, as well as the policies of the other insurers, on the basis of identical "contractual liability" exclusions in those policies. The court did not address the other coverage issues. *American Family Mut. Ins. Co. v. Pleasant Co.,* 2002 WI App 229, ¶ 26, 257 Wis. 2d 771, 652 N.W.2d 123. We accepted review.

31

## II. STANDARD OF REVIEW AND PRINCIPLES OF INTERPRETATION

¶ 22. We review a summary judgment pursuant to the same standards and methodology as the circuit court. *Frost v. Whitbeck,* 2002 WI 129, ¶ 4, 257 Wis. 2d 80, 654 N.W.2d 225. Summary judgment is properly granted if there is no genuine issue of material fact in dispute and the moving party is entitled to judgment as a matter of law. *Id.*

¶ 23. This case involves the interpretation of an insurance contract and thus presents a question of law that we review de novo. *Id.,* ¶ 5. Judicial interpretation of a contract, including an insurance policy, seeks to determine and give effect to the intent of the contracting parties. *Wisconsin Label Corp. v. Northbrook Property & Cas. Ins. Co.,* 2000 WI 26, ¶ 23, 233 Wis. 2d 314, 607 N.W.2d 276. Insurance polices are construed as they would be understood by a reasonable person in the position of the insured. *Kremers-Urban Co. v. American Employers Ins. Co.,* 119 Wis. 2d 722, 735, 351 N.W.2d 156 (1984). However, we do not interpret insurance policies to provide coverage for risks that the insurer did not contemplate or underwrite and for which it has not received a premium. *Wisconsin Label,* 233 Wis. 2d 314, ¶ 25.

¶ 24. Our procedure follows three steps. First, we examine the facts of the insured's claim to determine whether the policy's insuring agreement makes an initial grant of coverage. If it is clear that the policy was not intended to cover the claim asserted, the analysis ends there. If the claim triggers the initial grant of

32

coverage in the insuring agreement, we next examine the various exclusions to see whether any of them preclude coverage of the present claim. Exclusions are narrowly or strictly construed against the insurer if their effect is uncertain. *Cardinal v. Leader Nat'l Ins. Co.,* 166 Wis. 2d 375, 382, 480 N.W.2d 1 (1992). We analyze each exclusion separately; the inapplicability of one exclusion will not reinstate coverage where another exclusion has precluded it. Exclusions sometimes have exceptions; if a particular exclusion applies, we then look to see whether any exception to that exclusion reinstates coverage. An exception pertains only to the exclusion clause within which it appears; the applicability of an exception will not create coverage if the insuring agreement precludes it or if a separate exclusion applies. *Silverton Enters. v. Gen. Cas. Co.,* 143 Wis. 2d 661, 422 N.W.2d 154 (Ct. App. 1988).

## III. DISCUSSION

A. The CGL policies

¶ 25. The precursor of today's standard commercial liability insurance contract was promulgated in 1940 and has since undergone five principal revisions, the most recent of which came into use in 1986. Today, most CGL insurance in the United States is written on standardized forms developed by the Insurances Services Office, Inc. (ISO). *Wisconsin Label,* 233 Wis. 2d 26, ¶ 26. *See also* 2 Jeffrey W. Stempel, *Law of Insurance Contract Disputes* §§ 14.01, 14.02 (2d ed. 1999).

¶ 26. Until 1966, standard CGL policies provided coverage for liabilities arising out of injury or damage "caused by an accident." 16 Eric Mills Holmes, *Holmes' Appelman on Insurance* § 117.3, 240 (2d ed. 2000). In response to uncertainty over whether the term "acci-

33

dent" included harm caused by gradual processes, the insurance industry removed the "accident" language from the insuring agreement and replaced it with the broader term "occurrence," defined as an accident, but also including gradual accidental harm; this coverage language is used to this day. 16 Holmes, *supra,* § 117.4, 297.

¶ 27. Standard CGL policies, including those at issue in this case, now cover "sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' . . . caused by an 'occurrence' that takes place in the 'coverage territory.' "

¶ 28. The CGL insuring agreement is a broad statement of coverage, and insurers limit their exposure to risk through a series of specific exclusions. There are exclusions for intended or expected losses; for contractually-assumed liabilities; for obligations under worker's compensation and related laws; for injury and damage arising out of aircraft and automobiles; and for several so-called "business risks."

¶ 29. The "business risk" exclusions, also known as "your work," "your product," and "your property" exclusions, have generated substantial litigation. 2 Stempel, *supra,* § 14.13, 14–127. "[I]nsurers draft liability policies with an eye toward preventing policyholders from . . . converting their liability insurance into protection from nonfortuitous losses such as claims based on poor business operations. The 'own work' and 'owned property' exclusions are two important and frequently litigated policy provisions designed to accomplish this purpose." *Id.* The 1986 version of the CGL contains a modified "business risk" exclusion that provides an exception for the work of subcontractors, *id.,* and will be discussed in greater detail below.

34

¶ 30. The CGL policies at issue here contain 15 separate exclusions lettered "a" through "n" of subsection I.A.2. This case requires an examination of several of these: exclusion (a), for expected or intended losses; exclusion (b), for contractually-assumed liabilities; and exclusions (j) and (l), the business risk exclusions for property damage to the insured's work. As we have noted, however, our first task is to determine whether the claimed loss is covered by the language of the insuring agreement's initial grant of coverage.

## B. The CGL's insuring agreement

¶ 31. The insuring agreement in American Family's CGL policies states that the insurer "will pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies." It further states that "[t]his insurance applies to 'bodily injury' and 'property damage' only if: . . . The 'bodily injury' or 'property damage' is caused by an 'occurrence' that takes place in the 'coverage territory.' "

¶ 32. The parties do not dispute that Renschler's liability to Pleasant arose within the coverage territory. Therefore, whether the insuring agreement confers coverage depends upon whether there has been "property damage" resulting from an "occurrence" within the meaning of the CGL policy language.

### i. "Property damage" and the economic loss doctrine

¶ 33. The policy defines "property damage" as "physical injury to tangible property, including all resulting loss of use of that property." The sinking,

buckling, and cracking of the 94DC as a result of the soil settlement qualifies as "physical injury to tangible property."

¶ 34. American Family characterizes Pleasant's claim against Renschler as one for economic loss rather than property damage, and argues that the economic loss doctrine bars coverage. The economic loss doctrine generally precludes recovery in tort for economic losses resulting from the failure of a product to live up to contractual expectations. *Wausau Tile, Inc. v. County Concrete Corp.*, 226 Wis. 2d 235, 245–46, 593 N.W.2d 445 (1999). The economic loss doctrine is "based on an understanding that contract law and the law of warranty, in particular, is better suited than tort law for dealing with purely economic loss in the commercial arena." *Daanen & Janssen, Inc. v. Cedarapids, Inc.*, 216 Wis. 2d 395, 403–04, 573 N.W.2d 842 (1998).

¶ 35. The economic loss doctrine operates to restrict contracting parties to contract rather than tort remedies for recovery of economic losses associated with the contract relationship. *Vogel v. Russo*, 2000 WI 85, ¶ 15, 236 Wis. 2d 504, 613 N.W.2d 177. The economic loss doctrine is a remedies principle. It determines how a loss can be recovered—in tort or in contract/warranty law. It does not determine whether an insurance policy covers a claim, which depends instead upon the policy language. *Id.* at ¶ 16.

¶ 36. The economic loss doctrine may indeed preclude tort recovery here (the underlying claim is in arbitration and not before us); regardless, everyone agrees that the loss remains actionable in contract,

pursuant to specific warranties in the construction agreement between Pleasant and Renschler.[4] To the extent that American Family is arguing categorically that a loss giving rise to a breach of contract or warranty claim can *never* constitute "property damage" within the meaning of the CGL's coverage grant, we disagree. "The language of the CGL policy and the purpose of the CGL insuring agreement will provide coverage for claims sounding in part in breach-of-contract/breach-of-warranty under some circumstances." 2 Stempel, *supra,* § 14A.02[d],14A-10. This is such a circumstance. Pleasant's claim against Renschler for the damage to the 94DC is a claim for "property damage" within the meaning of the CGL's coverage grant.

---

[4] Accordingly, we generally agree with Justice Crooks' articulation of the principles underlying the economic loss doctrine. *See generally,* Justice Crooks' dissent, ¶¶ 95–98. Although the underlying claim between Pleasant and Renschler is in arbitration and not before us, we have assumed for purposes of this opinion that the economic loss doctrine applies, and have decided the insurance coverage questions as though the claim between Pleasant and Renschler is actionable in breach of contract/breach of warranty only. The question here is not whether Pleasant is confined to a contract rather than tort remedy in its claim against Renschler (we assume for purposes of this opinion that it is), but whether Renschler's insurance policy with American Family covers the loss. Our conclusion that the loss is covered is fully consistent with the economic loss doctrine. The contract parties allocated their risks by warranty, and Renschler insured against that risk where subcontractor fault gives rise to liability under the warranty, because Renschler's CGL policies with American Family contained a subcontractor exception to the business risk exclusion. *See* Part IIIE, *infra.*

ii. "Occurrence"

██

¶ 37. Liability for "property damage" is covered by the CGL policy if it resulted from an "occurrence." "Occurrence" is defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." The term "accident" is not defined in the policy. The dictionary definition of "accident" is: "an event or condition occurring by chance or arising from unknown or remote causes." *Webster's Third New International Dictionary of the English Language* 11 (2002). Black's Law Dictionary defines "accident" as follows: "The word 'accident,' in accident policies, means an event which takes place without one's foresight or expectation. A result, though unexpected, is not an accident; the means or cause must be accidental." *Black's Law Dictionary* 15 (7th ed. 1999).

██

¶ 38. No one seriously contends that the property damage to the 94DC was anything but accidental (it was clearly not intentional), nor does anyone argue that it was anticipated by the parties. The damage to the 94DC occurred as a result of the continuous, substantial, and harmful settlement of the soil underneath the building. Lawson's inadequate site-preparation advice was a cause of this exposure to harm. Neither the cause nor the harm was intended, anticipated, or expected.[5]

---

[5] Justice Roggensack's dissent asserts that the soil settlement and resultant property damage were expected by the parties because the construction contract contained a warranty against defects. Justice Roggensack's dissent, ¶¶ 108, 117, 119. While the warranty in question was specifically inserted in the construction contract under the subheading "Additional Warranties," it is nevertheless stated in broad and general terms.

We conclude that the circumstances of this claim fall within the policy's definition of "occurrence."

¶ 39. American Family argues that because Pleasant's claim is for breach of contract/breach of warranty it cannot be an "occurrence," because the CGL is not intended to cover contract claims arising out of the insured's defective work or product. We agree that CGL policies generally do not cover contract claims arising out of the insured's defective work or product, but this is by operation of the CGL's business risk exclusions, not because a loss actionable only in contract can never be the result of an "occurrence" within the meaning of the CGL's initial grant of coverage. This distinction is sometimes overlooked, and has resulted in some regrettably overbroad generalizations about CGL policies in our case law.

¶ 40. For example, in *Bulen v. West Bend Mut. Ins. Co.*, 125 Wis. 2d 259, 371 N.W.2d 392 (Ct. App. 1985), the court of appeals found no coverage under a CGL policy for damage caused by the collapse of a basement wall during construction of a private residence. The court held that certain of the policy's business risk exclusions applied to the circumstances presented. In doing so, the court quoted from *Weedo v. Stone-E-Brick, Inc.*, 405 A.2d 788 (N.J. 1979):

> The insured, as a source of goods or services, may be liable as a matter of contract law to make good on products or work which is defective or otherwise unsuitable because it is lacking in some capacity. This may even extend to an obligation to completely replace or rebuild the deficient product or work. This liability, however, is not what the coverages in question are

The provision of a general warranty against defects does not support a conclusion that the contract parties expected a particular loss to occur.

designed to protect against. The coverage is for tort liability for physical damages to others and not for contractual liability of the insured for economic loss because the product or completed work is not that for which the damaged person bargained.

*Bulen,* 125 Wis. 2d at 265 (quoting *Weedo,* 405 A.2d at 791). In this passage, the *Weedo* court was itself quoting Dean Henderson, *Insurance Protection for Products Liability and Completed Operations: What Every Lawyer Should Know,* 50 Neb. L. Rev. 415, 441 (1971). *Bulen,* and the *Weedo* passage it cited (derived from Henderson), re-appear continually in CGL coverage litigation. *See Vogel,* 236 Wis. 2d 504, ¶ 17; *Wisconsin Label,* 233 Wis. 2d 314, ¶ 27.

¶ 41. Despite this broad generalization, however, there is nothing in the basic coverage language of the current CGL policy to support any definitive tort/contract line of demarcation for purposes of determining whether a loss is covered by the CGL's initial grant of coverage. "Occurrence" is not defined by reference to the legal category of the claim. The term "tort" does not appear in the CGL policy.[6]

---

[6] In this regard, we cannot agree with the position advanced by Justice Crooks' dissent that a loss actionable as a breach of contract/breach of warranty can never constitute an "occurrence" within the meaning of the CGL policy's coverage grant. Justice Crooks' dissent, ¶¶ 89, 93. The CGL policy's basic coverage language does not distinguish between losses actionable in tort and losses actionable in contract. As we have noted, the definition of "occurrence" in the CGL policy does not refer to the legal category of the claim; there is no language limiting the term to those occurrences that are actionable only in tort. While an insured's breach of contract/breach of warranty liability will

40

¶ 42. *Bulen* and *Weedo*, interpreting pre-1986 CGL policies, never discussed the insuring agreement's initial grant of coverage; rather, the cases were decided on the basis of the business risk exclusions. Indeed, the *Weedo* court explicitly stated that "but for the exclusions in the policy, coverage would obtain. Hence we need not address the validity of one of the carrier's initially-offered grounds of non-coverage, namely, that the policy did not extend coverage for the claims made even absent the exclusions." *Weedo*, 405 A.2d at 790 n.2. In short, *Weedo* does not hold that losses actionable as breaches of contract cannot be CGL "occurrences," and therefore neither does *Bulen.*

¶ 43. For the same reason, our decision in *Vogel*, which relied at length on the broad *Bulen/Weedo* quote from Henderson, is not controlling on the meaning of "occurrence" in a CGL policy. In *Vogel,* we held that the business risk exclusions in a CGL policy precluded coverage for damage caused by the faulty masonry work of a subcontractor. *Vogel*, 236 Wis. 2d 504, ¶ 19. Our no-coverage conclusion in *Vogel* rested on the business risk exclusion, not on any inherent limitation in the initial grant of coverage. Accordingly, we caution that neither *Bulen* nor *Vogel* should be read for the conclusion that a loss actionable in contract rather than tort can never constitute a covered "occurrence" under a CGL policy.

¶ 44. Indeed, this court has never held that the CGL insuring agreement only covers torts. In *Doyle v. Engelke*, 219 Wis. 2d 277, 580 N.W.2d 245 (1998), for instance, we decided a CGL coverage dispute involving a policy that used the term "event" instead of "occur-

often fall within the business risk exclusions, *see* Part IIIE, *infra,* it does not categorically fall outside the policy's definition of "occurrence."

rence," but which defined "event" in exactly the same way that "occurrence" is defined in the CGL policy here. We took note of the "common, everyday meaning" of "accident:" " 'an unexpected, undesirable event' or 'an 'unforeseen incident' which is characterized by a 'lack of intention.' " *Id.* at 289 (quoting *The American Heritage Dictionary of the English Language* 11 (3d ed. 1992)). We also noted the commonalities in the standard dictionary definitions of "accident" and "negligence," and remarked that "[I]t is significant that both definitions center on an unintentional occurrence leading to undesirable results." *Doyle,* 219 Wis. 2d at 289–90.

¶ 45. *Doyle* did not, however, equate the term "accident," as used in the CGL policy, with negligence as a form of legal liability; we simply held that negligent acts were "accidental" within the meaning of the CGL's definition of "event." *Id.* ("[W]e have little trouble concluding that a reasonable insured would expect the Policy provision defining 'event' to include negligent acts.") *Doyle* did not imply that there could never be CGL coverage unless the accidental "event" (here, "occurrence") was actionable in tort as negligence.

¶ 46. Furthermore, contrary to American Family's suggestion, *Wausau Tile* did not establish a "generally accepted" rule that a breach of contract or warranty cannot be an "occurrence" for purposes of CGL coverage. In *Wausau Tile,* we concluded that certain tort claims between Wausau Tile and its cement supplier, Medusa Cement, were barred by the economic loss doctrine. *Wausau Tile,* 226 Wis. 2d at 247–254. Having disposed of the tort claims in the case, we briefly addressed Medusa's insurer's duty to defend the remaining contract/warranty claims, noting only that the issue of whether the alleged breach of contract or warranty was a covered "occurrence" under the

42

insurer's policy was "undisputed." *Id.* at 268–69. Here, unlike in *Wausau Tile,* the issue is disputed.

¶ 47. If, as American Family contends, losses actionable in contract are never CGL "occurrences" for purposes of the initial coverage grant, then the business risk exclusions are entirely unnecessary. The business risk exclusions eliminate coverage for liability for property damage to the insured's own work or product— liability that is typically actionable between the parties pursuant to the terms of their contract, not in tort. If the insuring agreement never confers coverage for this type of liability as an original definitional matter, then there is no need to specifically exclude it. Why would the insurance industry exclude damage to the insured's own work or product if the damage could never be considered to have arisen from a covered "occurrence" in the first place?

¶ 48. The court of appeals has previously recognized that the faulty workmanship of a subcontractor can give rise to property damage caused by an "occurrence" within the meaning of a CGL policy. In *Kalchthaler v. Keller Construction Co.,* 224 Wis. 2d 387, 395, 591 N.W.2d 169 (Ct. App. 1999), a general contractor subcontracted out all the work on a construction project; the completed building subsequently leaked, causing over $500,000 in water damage. The court of appeals noted that the CGL defined "occurrence" as "an accident," and further noted that "[a]n accident is an 'event or change occurring without intention or volition through carelessness, unawareness, ignorance, or a combination of causes and producing an unfortunate result.' " *Id.* at 397 (quoting *Webster's Third New International Dictionary* 11 (1993)). The court of appeals

concluded that the leakage was an accident and therefore an occurrence for purposes of the CGL's coverage grant. *Id.*

¶ 49. The same is true here. We conclude that the property damage to the 94DC was the result of an "occurrence" within the meaning of the insuring agreement.[7] This brings us to the policy exclusions. American Family invokes several.

C. The "expected or intended" exclusion

¶ 50. Exclusion (a) eliminates coverage for " 'property damage' expected or intended from the standpoint of the insured.' " American Family argues that given the poor soil conditions at the site, and Renschler's recognition that special measures were required to prepare the soil to carry the weight of the 94DC, Renschler expected that some settlement would occur, and therefore this exclusion applies. We disagree.

¶ 51. American Family does not argue that "property damage" was expected or intended by the insured (which is what the exclusion requires), only that some degree of settlement must have been expected under the circumstances. This is insufficient to trigger the exclusion. American Family cites two cases, *Pachucki v. Republic Insurance Co.,* 89 Wis. 2d 703, 278 N.W.2d 898 (1979), and *Raby v. Moe,* 153 Wis. 2d 101, 450 N.W.2d

---

[7] The parties cite numerous extra-jurisdictional cases on the question of whether defective workmanship can be a CGL "occurrence." The authorities are split; some cases hold yes, others no. Some rely on the overbroad generalizations about CGL policies that we have identified and discussed above. All are highly fact-specific. For these reasons we confine our analysis on this issue to Wisconsin case law.

44

452 (1990). Both of these involved intentional infliction of bodily injury and are therefore inapplicable here.

D. The "contractually-assumed liability" exclusion

¶ 52. The court of appeals held that exclusion (b), for contractually-assumed liabilities, applied to preclude coverage under all the policies at issue in this case. Exclusion (b) states:

> This insurance does not apply to:
>
> . . . .
>
> b. "Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages:
>
>> (1) Assumed in a contract or agreement that is an "insured contract," provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement; or
>>
>> (2) That the insured would have in the absence of the contract or agreement.

¶ 53. The court of appeals held that Renschler's construction contract for the 94DC constituted a contractually-assumed liability within the meaning of the exclusion, citing *Nelson*, 158 Wis. 2d 647. In *Nelson*, the insured, an auction company, was sued by the owner of an automobile who had placed the automobile with the company to auction for a specified reserve price. *Id.* at 650. Due to an employee's negligence, the auction company sold the automobile for far less than the agreed-upon reserve price, and the owner refused to deliver the automobile to the purchaser. When the

purchaser sued the owner for specific performance, the owner impleaded the auction company and its CGL insurance carrier.

¶ 54. The CGL policy in *Nelson* included an exclusion for contractually-assumed liabilities identical to the one at issue in this case. After quoting the relevant exclusion language, the *Nelson* court concluded summarily that the policy "clearly excludes coverage for incidents involving purely contractual liabilities." *Id.* The court offered no authority for this broad proposition, nor did it discuss the exclusion language or any other language from the policy in its opinion.

¶ 55. In applying *Nelson* to this case, the court of appeals noted that it "arguably conflicts" with a subsequent court of appeals' decision, *Meyer v. United States Fire Insurance Co.,* 218 Wis. 2d 499, 582 N.W.2d 40 (Ct. App. 1998). In *Meyer,* the court considered whether an employer's commercial umbrella policy provided coverage for an employee's injury caused by a co-employee.[8] The policy excluded coverage for bodily injury to an employee arising out of employment with the insured, but also provided: "We will pay on behalf of the 'Insured' those sums in excess of the 'Retained Limit' which the 'Insured' by reason of liability imposed by law, *or assumed by the 'Insured' under contract* prior to the 'Occurrence,' shall become legally obligated to pay as damages for [bodily injury]." *Id.* at 504–05 (emphasis in

[8] The insurance policy in *Meyer v. United States Fire Insurance Co.,* 218 Wis. 2d 499, 582 N.W.2d 40 (Ct. App. 1998), was not a CGL but a commercial umbrella policy, and the "contractually-assumed liability" language is contained in a coverage grant rather than a coverage exclusion. These distinctions do not appear to account for the difference in legal analysis between *Meyer* and *Nelson v. Motor Tech, Inc.,* 158 Wis. 2d 647, 462 N.W.2d 903 (Ct. App. 1990).

original). The employer had a motor vehicle liability policy with another insurer that contained an endorsement deleting the standard exclusion for co-employee liability. If the exclusion had not been deleted, the remedy against the employer would have been circumscribed by the terms of the worker's compensation statute.

¶ 56. The precise issue in *Meyer* was whether by deleting the co-employee exclusion, the employer had "assumed . . . under contract" liability for its employee's injury. To resolve this issue, the *Meyer* court adopted the reasoning of *Dreis & Krump Manufacturing Co. v. Phoenix Insurance Co.,* 548 F.2d 681 (7th Cir. 1977), which held that " 'liability assumed [by the insured] under any written contract' means 'a specific written agreement between the insured and a third party whereby the insured agrees to 'indemnify' the third party." *Meyer,* 218 Wis. 2d at 505 (quoting *Dreis & Krump,* 548 F.2d at 684). The *Meyer* court found no coverage under the employer's umbrella policy because the deletion of the co-employee liability exclusion did not constitute an indemnification agreement with a third party. *Id.*

¶ 57. The *Meyer/Dreis* interpretation of "contractually-assumed liability" is more consistent with the actual CGL policy language than the broader *Nelson* interpretation, and appears to be generally accepted by commentators and courts around the country. "The key to understanding this exclusion . . . is the concept of liability assumed." 2 Rowland H. Long, *The Law of Liability Insurance* § 10.05[2], 10–56, 10–57 (2002). As one important commentator has noted,

> Although, arguably, a person or entity assumes liability (that is, a duty of performance, the breach of which will give rise to liability) whenever one enters into a binding

> contract, in the CGL policy and other liability policies an "assumed" liability is generally understood and interpreted by the courts to mean the liability of a third party, which liability one "assumes" in the sense that one agrees to indemnify or hold the other person harmless.

21 Holmes, *supra,* § 132.3, 36–37.

¶ 58. The term "assumption" must be interpreted to add something to the phrase "assumption of liability in a contract or agreement." Reading the phrase to apply to all liabilities sounding in contract renders the term "assumption" superfluous. We conclude that the contractually-assumed liability exclusion applies where the insured has contractually assumed the liability of a third party, as in an indemnification or hold harmless agreement; it does not operate to exclude coverage for any and all liabilities to which the insured is exposed under the terms of the contracts it makes generally.

¶ 59. This reading is consistent with the general purposes of liability insurance because it enables insurers to enforce the fortuity concept by excluding from coverage any policyholder agreements to become liable after the insurance is in force and the liability is a certainty. *See* 2 Stempel, *supra,* § 14.14, 14–141. Limiting the exclusion to indemnification and hold-harmless agreements furthers the goal of protecting the insurer from exposure to risks whose scope and nature it cannot control or even reasonably foresee. The relevant distinction "is between incurring liability as a result of a breach of contract and specifically contracting to assume liability for another's negligence." *Olympic, Inc. v. Providence Washington Ins. Co.,* 648 P.2d 1008, 1011 (Ala. 1982).

¶ 60. Courts in other jurisdictions have held that the contractually-assumed liability exclusion "refers to a specific contractual assumption of liability by the insured as exemplified by an indemnity agreement." 21 Holmes, *supra*, § 132.3, 40. *See also Musgrove v. Southland Corp.*, 898 F.2d 1041, 1044 (5th Cir. 1990); *Action Auto Stores v. United Capitol Ins. Co.*, 845 F.Supp. 428, 442 (W.D. Mich. 1993); *Gibbs M. Smith, Inc. v. United States Fidelity & Guar. Co.*, 949 P.2d 337, 341 (Utah 1997); *Marlin v. Wetzel Co. Bd. Of Educ.*, 569 S.E.2d 462, 469 (W.Va. 2002).

¶ 61. This interpretation of exclusion (b) is consistent with the evolution of the CGL policy over time. Prior to the 1986 revision, the exclusion for contractually-assumed liabilities was achieved through language in the insuring agreement that granted coverage for "contractual liabilities." Coverage was extended to certain types of contractual obligations but not others. With the 1986 revision, however, this language was moved into the exclusions section, and the basic coverage for certain contractual obligations was retained by inserting an exception to the exclusion for "insured contracts."

██

¶ 62. Accordingly, we conclude that the language in *Nelson* that the contractually-assumed liability exclusion "clearly excludes coverage for incidents involving purely contractual liabilities" is overbroad, and hereby overrule that portion of *Nelson*'s holding. This case does not involve a claim for "contractually-assumed liability," properly understood. The breach of contract/warranty liability at issue here is Renschler's direct liability to its contract partner, Pleasant, pursuant to warranties in the construction contract. Ren-

schler is not claiming coverage for a claim made against it pursuant to a third-party indemnification or hold harmless agreement.

### E. The "business risk" exclusions

¶ 63. The business risk exclusions (j) through (n) preclude coverage generally for property damage to the work of the insured. Several of these are implicated here. The first, exclusion (j), contains the following language:

> This insurance does not apply to:
>
> j. "Property damage" to:
>
> . . . .
>
> (6) That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.
>
> . . . .
>
> Paragraph (6) of this exclusion does not apply to "property damage" included in the "products-completed operations hazard."
>
> The policy defines "your work" as:
>
> a. Work or operations performed by you or on your behalf;
>
> . . . .
>
> "Your work" includes:
>
> a. Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work;"

¶ 64. Renschler's work on the 94DC, as well as Lawson's engineering work under subcontract to Renschler, both fall within the definition of "your work." Exclusion (j) comes into play because Pleasant's claim against Renschler involves the repair and replacement of the 94DC.

¶ 65. However, if the property damage that occurred falls within the "products-completed operations hazard," exclusion (j) does not apply. The "products-completed operations hazard" includes:

> [A]ll "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except:
>
> (1) Products that are still in your physical possession; or
>
> (2) Work that has not yet been completed or abandoned.

¶ 66. The damage to the 94DC occurred away from premises that Renschler owns or rents, and it arose out of Renschler's "own work" because, as we have indicated, Renschler's work on the 94DC falls within the policy definition of "your work." Work on the 94DC was substantially completed in August 1994, and Pleasant occupied the premises at that time. The settlement was noticed in March 1995. Damage to the property therefore occurred after the work had been completed, so exception (2) does not apply. Thus the property damage at issue in this case falls within the "products-completed operations hazard" and exclusion (j) does not apply.

¶ 67. This brings into play exclusion (l), for "property damage to your work" inside the "products-completed operations hazard":

51

This insurance does not apply to:

l. "Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard."

This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

By its terms, exclusion (l) would operate to exclude coverage under the circumstances of this case but for the exception that specifically restores coverage when the property damage arises out of work performed by a subcontractor. It is undisputed that Lawson's negligent soils engineering work was a cause of the soil settlement and resultant property damage to the 94DC.

¶ 68. This subcontractor exception dates to the 1986 revision of the standard CGL policy form. Prior to 1986 the CGL business risk exclusions operated collectively to preclude coverage for damage to construction projects caused by subcontractors. Many contractors were unhappy with this state of affairs, since more and more projects were being completed with the help of subcontractors. In response to this changing reality, insurers began to offer coverage for damage caused by subcontractors through an endorsement to the CGL known as the Broad Form Property Damage Endorsement, or BFPD. Introduced in 1976, the BFPD deleted several portions from the business risk exclusions and replaced them with more specific exclusions that effectively broadened coverage. Among other changes, the BFPD extended coverage to property damage caused by the work of subcontractors. In 1986 the insurance industry incorporated this aspect of the BFPD directly into the CGL itself by inserting the subcontractor

exception to the "your work" exclusion. *See generally* 21 Holmes, *supra,* § 132.9, 152–53.

¶ 69. Cases in Wisconsin and in other jurisdictions have consistently recognized that the 1986 CGL revisions restored otherwise excluded coverage for damage caused to construction projects by subcontractor negligence. In *Kalchthaler,* the court of appeals concluded that "[t]he only reasonable reading of [the 1986 exception] is that it restores coverage for damage to completed work caused by the work of a subcontractor." *Kalchthaler,* 224 Wis. 2d at 391.

¶ 70. The court of appeals' straightforward reading of the subcontractor exception to the business risk exclusion in *Kalchthaler* was buttressed by a similar holding in a case from Minnesota, *O'Shaughnessy v. Smuckler Corp.,* 543 N.W.2d 99 (Minn. Ct. App. 1996), in which the Minnesota Court of Appeals found coverage for improper subcontractor performance that caused damage to a residential home project.

¶ 71. Like the *O'Shaughnessy* court, the court in *Kalchthaler* recognized that the effect of the 1986 revision of the CGL could not be defeated by reliance upon broad judicial holdings interpreting pre-1986 policies that did not contain the subcontractor exception. "For whatever reason, the industry chose to add the new exception to the business risk exclusion in 1986. We may not ignore that language when interpreting case law decided before and after the addition. To do so would render the new language superfluous." *Kalchthaler,* 224 Wis. 2d at 400.

¶ 72. Courts in other jurisdictions have reached the same conclusion when interpreting the post-1986 subcontractor exception or policy endorsements containing identical language. *See Wanzek Constr., Inc. v. Employers Ins. of Wausau,* 667 N.W.2d 473 (Minn. Ct.

App. 2003); *Kvaerner Metals v. Commercial Union Ins. Co.,* 825 A.2d 641 (Pa. Super. Ct. 2003); *L-J, Inc. v. Bituminous Fire and Marine Ins. Co.,* 567 S.E.2d 489 (S.C. Ct. App. 2002)(certiorari granted May 15, 2003); *CU Lloyd's of Texas v. Main Street Homes, Inc.,* 79 S.W.3d 687 (Tex. Ct. App. 2002).

¶ 73. American Family cites conflicting authorities which appear to hold that damage to an insured's work caused by a subcontractor is not covered because of the "your work" exclusion, but these authorities are no longer controlling because they construed policies that did not include the subcontractor exception. Noting the apparent conflict between *O'Shaughnessy, Kalchthaler,* and similar cases on the one hand, and contrary cases on the other, one commentator has pointed out that "those cases [finding no coverage] involved the older policy language while the current policy specifically provides that the 'own work' exclusion does not apply 'if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.' " 2 Stempel, *supra,* § 14.13[a], 14–132.

¶ 74. This interpretation of the subcontractor exception to the business risk exclusion does not "create coverage" where none existed before, as American Family contends. There is coverage under the insuring agreement's initial coverage grant. Coverage would be excluded by the business risk exclusionary language, except that the subcontractor exception to the business risk exclusion applies, which operates to restore the otherwise excluded coverage.

¶ 75. Accordingly, Renschler's CGL base policies with American Family cover Pleasant's claim. We also agree with the circuit court's application of the "continuous trigger" holdings of *Society Insurance v. Town*

*of Franklin,* 2000 WI App 35, ¶¶ 8–10, 233 Wis. 2d 207, 607 N.W.2d 342, and *Wisconsin Electric Power Co. v. California Union Insurance Co.,* 142 Wis. 2d 673, 419 N.W.2d 255 (Ct. App. 1987). The "continuous trigger" theory generally applies where an injury or damage occurs over more than one policy period. *Society Insurance,* 233 Wis. 2d at 215; *Wisconsin Electric,* 142 Wis. 2d at 681. The continuous trigger theory interprets the term "occurrence" in CGL policies to include continual, recurring damage as well as damage that occurs at one moment in time. *Id.*

¶ 76. The property damage to the 94DC occurred continuously over a period extending from the later part of the 1994–95 policy term, throughout the 1995–96 policy term, and well into the 1996–97 policy term. Settlement had reached eight inches by the spring of 1995, when the first policy was still in force, and continued throughout 1996 and into 1997, by which time it was approaching one foot. Accordingly, under the continuous trigger holdings of *Society Insurance* and *Wisconsin Electric,* the policies for the years 1994–95, 1995–96, and 1996–97 cover this loss.

F. American Family's excess policies

¶ 77. Renschler also had excess liability policies with American Family for the years 1993–94, 1994–95, 1995–96, and 1996–97. The circuit court held that there was no coverage under the 1993–94 policy because there had been no occurrence before the end of the 1993–94 policy term, and no coverage under the remaining excess policies because the professional services liability exclusions in those policies excluded coverage.

¶ 78. The court of appeals affirmed, but did so because of the contractually-assumed liability exclusion in the policies. We have rejected the court of appeals' interpretation of the contractually-assumed liability exclusion. We agree, however, with the circuit court's conclusion that the professional services liability exclusion in the excess policies excludes coverage.

¶ 79. Renschler's Commercial Blanket Excess Liability Policy contains the following endorsement:

Professional liability exclusion.

Insurance under this policy does not apply to any liability arising out of the rendering of or failure to render professional services in the conduct of **your** business or profession. (Emphasis in original.)

¶ 80. It is undisputed that Lawson's inadequate soil engineering advice was a substantial factor in causing the excessive soil settlement and resulting property damage to the 94DC. Renschler is responsible to Pleasant for the flaws in Lawson's professional services pursuant to the broad warranty in the construction contract. Accordingly, the liability here arises out of the rendering of professional services, and by its terms, this exclusion applies.

¶ 81. Pleasant and Renschler argue that *Leverence v. United States Fidelity & Guaranty,* 158 Wis. 2d 64, 462 N.W.2d 218 (Ct. App. 1990), compels a contrary conclusion. *Leverence* involved claims by homeowners against a builder whose negligence in the construction of their homes caused excessive moisture retention, which in turn promoted the growth of hazardous mold, mildew, fungus, and other toxins. The builder's insurer argued that the professional services liability exclusion in the insurance policy barred coverage.

¶ 82. The court of appeals disagreed, concluding that because "the claims arise out of manufacture of an allegedly defective product and not malpractice in rendering of a professional service," the exclusion did not apply. *Leverence*, 158 Wis. 2d at 83. The court declined to separate the builder's professional design services from its construction services for purposes of evaluating the applicability of the exclusion: "to break down [the builder's] activities into separate components, and then bar claims arising out of its manufactured product because intellectual skills were employed would go beyond the normal rules of contract interpretation." *Id.* at 84. The court noted that "[a]lthough the homes' design allegedly contributed to the claimed injuries, the primary objective of [the builder's] operations was the production of a prefabricated home, not a design of a home," and therefore the professional services liability exclusion did not apply. *Id.* at 85.

¶ 83. The court in *Leverence* cautioned, however, that it was not concluding "that nothing constitutes a professional service [within the meaning of the exclusion] if it results at some point in the production of a commodity," giving as an example the rendering of architectural design services in connection with the construction of a building. *Id.*

¶ 84. We conclude that this case falls outside the holding of *Leverence*. While it is true, as Pleasant notes, that Renschler furnished a building, the liability at issue here "arises out of the rendering of professional services"—Lawson's faulty site-preparation advice— which falls squarely within the language of the exclusion. This case thus does not pose the analytical dilemma that troubled the court in *Leverence;* there, the professional services inextricably combined with the

manufacturing services to produce the claimed injury. Here, it is undisputed that flawed professional soil engineering services were a substantial factor in causing the excessive soil settlement and resultant property damage to the 94DC. Accordingly, we conclude that the professional services liability exclusion in American Family's excess policies applies.

G. The four other insurers

¶ 85. Renschler also had insurance policies from four other insurers: Ohio Casualty Insurance Company and West American Insurance Company, which issued CGL and excess liability policies respectively for April 1, 1997, through April 1, 1999, and General Casualty Insurance Company and Regent Insurance Company, which issued CGL and umbrella liability policies, respectively, thereafter. The circuit court held that the known loss or loss-in-progress doctrine precluded coverage under all of these policies.[9] We agree.

¶ 86. The known loss doctrine holds that insurers are not obligated to cover losses which are already occurring when the coverage is written or which has already occurred. *Estate of Logan v. Northwestern Nat'l*, 144 Wis. 2d 318, 348, 424 N.W.2d 179 (1988). Here, the fact that settlement was occurring on the 94DC was known as early as March of 1995, and the extent of the damage was substantially known by the time of the meeting in January or February, 1997. The policies of

---

[9] The court of appeals resolved the coverage question as to these additional policies by reference to its interpretation of the contractually-assumed liability exclusion, which we have rejected.

these remaining insurers post-date this period. Accordingly, the known loss doctrine precludes coverage under these policies.

¶ 87 *By the Court.*—The decision of the court of appeals is reversed and the cause remanded for proceedings consistent with this opinion.

¶ 88. SHIRLEY S. ABRAHAMSON, C.J. and JON P. WILCOX, J., did not participate.

¶ 89. N. PATRICK CROOKS, J. (*dissenting*). I disagree with the majority's conclusion that there is coverage under the CGL policies issued by American Family. Although I agree with Justice Roggensack's dissent, I write separately to address an issue the majority concedes is relevant, yet touches on only briefly. In this case, there are contract claims for breach of warranty resulting in economic loss. Breach of contract/breach of warranty resulting in economic loss is not a covered "occurrence" under the plain language of the CGL policies' general grant of coverage. American Family and the other CGL insurers have no duty to defend or indemnify Renschler against Pleasant's damage claims, since the CGL policies at issue do not cover the contract claims, and the economic loss doctrine prevents any tort claim as well. Thus, I conclude there can be no coverage in this case, as the requirements for both liability and recovery of damages are not satisfied.

¶ 90. As the majority acknowledges, the economic loss doctrine confines the parties to contract remedies for recovery of purely economic losses associated with the contract relationship. Majority op., ¶ 35. Economic loss is characterized by the pecuniary damage that occurs due to the loss in a product's value because the product is " 'inferior in quality and does not work for the general purposes for which it was manufactured and

59

sold.' " *Wausau Tile, Inc. v. County Concrete Corp.*, 226 Wis. 2d 235, 246, 593 N.W.2d 445 (1999) (citation omitted). It includes both direct economic losses (i.e., harm to the product itself) and any resulting consequential damages (i.e., lost profits). *Id.* Repair and replacement costs are common signs of economic loss. *Id.* at 248. Damages causing personal injury or harm to property other than the defective product fall outside the economic loss doctrine and find suitable remedy in tort law. *Id.* at 247.

¶ 91. Pleasant asserts the following damages resulted from Renschler's construction of building 94DC: deformation of steel supports, cracks in floor, movement of sewer lines, crinkling, screws being ripped out, cracks in the drywall, cringing of the walls, leaking of exterior panels and windows, roofline settlement, and beam separation. All of these asserted damages meet the requirements for economic losses. The damages fall within the definition of economic loss because Renschler's work product was alleged to be of inferior quality and failed its intended purpose. Furthermore, Pleasant made no claims asserting personal injury or damage to property other than to the product—building 94DC— itself.

¶ 92. Renschler allegedly breached its contract with Pleasant by failing to construct a building· free from defects, as warranted. Under the terms of the contract, Renschler was liable for any consequential damages if there were defects in the distribution center warehouse designated as 94DC. Determining whether breach of contract/breach of warranty is covered as an "occurrence" within the meaning of a CGL policy requires an analysis of the policy language.

¶ 93. The CGL policies at issue do not cover the insured's contractual liability for economic loss. The

CGL policies purchased by Renschler from American Family cover "sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' . . . only if . . . the 'bodily injury' or 'property damages' is caused by an 'occurrence' . . . ." The policies define an "occurrence" as "an accident." The policy language does not list breach of contract/breach of warranty as a covered damage, nor can breach of contract/breach of warranty fall within the policies' definition of "occurrence." In *Wausau Tile, Inc.*, 226 Wis. 2d at 269, we stated that "it is undisputed that the breach of a contract or warranty is not a covered 'occurrence' under the Travelers policy." That policy used the same definition of "occurrence" as the one at issue here. Because breach of contract/breach of warranty is not covered by the CGL policies issued by American Family, it has no duty to defend or indemnify Renschler against Pleasant's claims.

¶ 94. The majority states that there are some circumstances where a breach of contract or warranty may constitute "property damage" under a CGL policy. Majority op., ¶ 36. The majority summarily holds this to be such a circumstance, but does not clearly explain why what happened here constitutes such an exception to our holdings in previous opinions of this court. Its decision departs from the authorities previously cited by this court that CGL policy "coverage is for tort liability for physical damages to others and not for contractual liability of the insured for economic loss." *Vogel v. Russo*, 2000 WI 85, ¶ 17, 236 Wis. 2d 504, 613 N.W.2d 177. CGL policies exist to protect the insured from tort damages resulting from personal injury or harm to property other than the product itself. *Wausau Tile Inc.*, 226 Wis. 2d at 248. The American Family policies, as well as the CGL policies issued by the other

61

insurers, were not meant to cover the business risk that Renschler's services would not be performed properly. By finding coverage in this case, the majority is essentially transforming these CGL policies into performance bonds. *Vogel,* 236 Wis. 2d, ¶ 17.

¶ 95. In *Wausau Tile, Inc.,* this court recognized three policy reasons supporting the application of the economic loss doctrine to commercial transactions. *Wausau Tile, Inc.,* 226 Wis. 2d at 247. First, it is important to preserve the distinction between contract and tort law. The two areas of law have varying goals. *Id.* Contract law aims to protect a party's bargained-for obligations, while tort law seeks to protect society from unanticipated, overwhelming misfortunes. *Id.* at 248. Without actively maintaining the differences between the two areas of law, tort law could easily engulf contract law. The second policy reason supporting the application of the economic loss doctrine is that it protects the parties' ability to draft contracts that best allocate economic risk between the parties. *Id.* at 247. Lastly, the economic loss doctrine encourages parties to assume, allocate or insure against the risks involved in a commercial transaction. *Id.*

¶ 96. Applying the economic loss doctrine to Pleasant's claims against Renschler satisfies the doctrine's three main objectives. First, finding coverage for breach of contract in CGL policies that routinely restrict coverage to tort damages blurs the line between contract and tort. Renschler and Pleasant should only receive the benefit of their bargained-for agreement. In this case, finding American Family liable for Renschler's contractual breach allows Renschler to receive more benefits than it bargained for.

¶ 97. Second, the economic loss doctrine protects the parties' freedom to allocate economic risk through

contract. Renschler assumed the risk that the building may sink when it warranted to Pleasant that the construction would be free of defects, and in the event that there were defects, Renschler would be liable for any consequential damages. Again, allowing Renschler to shirk this assumed liability by finding coverage in the CGL policies exceeds the parties' bargained-for agreement.

¶ 98. Third, the economic loss doctrine encourages the parties to assume, allocate, or insure against the risks involved in a commercial transaction. Pleasant and Renschler were best situated to assess the risk of settlement and insure against that risk. Pleasant allocated the risk to Renschler by inserting a warranty into the construction contract, specifically addressing the land's known poor subsoil conditions and the risk of settlement. By finding liability here, the majority unnecessarily negates the parties' agreed-upon terms.

¶ 99. Some commentators have stated that every case denying relief based on the economic loss doctrine contains two common characteristics. Harper, James & Gray, *The Law of Torts* 622 (1986). First, the defendant's wrong does not occur outside the realm of lawful conduct. *Id.* Renschler's wrong clearly fits into this category because, as the majority itself notes, the settlement damages were the unintentional result of the company's legitimate business activity. Majority op., ¶ 5.

¶ 100. Second, the economic loss doctrine applies when the plaintiff's loss is purely economic and would be recoverable if a negligence test of duty were applied. *The Law of Torts* at 622. Pleasant's loss fits into this category as well, because damages were purely economic and would be recoverable if a negligence test were applied. The test of negligence in Wisconsin re-

quires a plaintiff to demonstrate: (1) a duty of care on the part of the defendant; (2) a breach of that duty; (3) a causal connection between the breach and the injury; and (4) actual loss or damage resulting from the injury. *Lemke-Wojnicki v. Kolodziaj,* 2002 WI App 316, ¶ 7, 258 Wis. 2d 950, 655 N.W.2d 212. Arguably, Renschler had a common law duty of care to carry out the contract's intended purposes. When Renschler's subcontractor negligently performed the soil analysis, Renschler breached that duty of care. The faulty soil analysis by the subcontractor, for whom Renschler was liable, caused the settlement that led to the physical damages. Under the analysis favored by the aforementioned commentators, coverage should be denied in this case, as both of the necessary factors are present that make the economic loss doctrine applicable.

¶ 101. Through the contractual warranty, Renschler assumed liability for defects in the construction of building 94DC. Because Renschler's services allegedly failed in the intended purpose of the contract, Renschler breached the contractual warranty. Breach of a contract or a warranty resulting in economic loss is not a covered "occurrence" under American Family's CGL policy. Since the CGL policies at issue do not cover the contract claims, and since the economic loss doctrine prevents any tort claim, American Family has no duty to defend or indemnify Renschler against Pleasant's damage claims. The same reasoning applies to the claims against the other insurers involved here.

¶ 102. For the foregoing reasons, I respectfully dissent, and also join the dissent of Justice Patience D. Roggensack.

¶ 103. I am authorized to state that JUSTICE PATIENCE D. ROGGENSACK joins this dissent.

¶ 104 PATIENCE D. ROGGENSACK, J. (*dissenting*). Before considering exceptions to coverage in the American Family insurance policy, we must first conclude that there has been an "occurrence" because the policy does not provide coverage under any circumstances unless the " 'property damage' is caused by an 'occurrence.' " Renschler Company asserts that the act that caused damage to the Pleasant Company's building was Clifton Lawson's allegedly inaccurate advice concerning compaction of the subsoil prior to the building's construction, which permitted the building to sink.[1] However, it was known that if subsoil compaction was not properly done, the completed building would sink and the damage to the building that has occurred would very likely occur. Therefore, the cause of the damage was simply the continuation of prior existing unstable subsoil conditions. Accordingly, I conclude the property damage at issue here was not caused by an accident, which is how "occurrence" is defined in the policy. Without an "occurrence," there is no potential coverage under Renschler's CGL policy. Because the majority concludes otherwise, I respectfully dissent.

## I. BACKGROUND

¶ 105. Pleasant's breach of warranty claim against Renschler arises from the construction of a warehouse that sank after construction, causing, among other problems, cracking of the concrete floor, buckling of the walls and malfunctioning windows. The warehouse was constructed on land that was known by Renschler and Pleasant, before construction, to have

---

[1] Throughout this appeal the full blame for the building's failure has been set at Clifton Lawson's feet. We have no record to show that this is true, but we will assume it is for the purposes of this analysis, as the parties do.

poor subsoil conditions that would lead to the building's sinking after construction unless those conditions were corrected. Because of the soil conditions, Renschler obtained the services of Clifton Lawson, a soils engineer, to analyze the soil conditions of the site and to direct how to correct them so that the building could be constructed in the location that Pleasant preferred.

¶ 106. Lawson recommended and measured the effects of a compaction process known as surcharging. Renschler performed the surcharging by placing large amounts of soil on top of the area where the building was to be constructed, and Lawson took compression measurements, eventually telling Renschler that the subsoil was compacted sufficiently to begin construction.

¶ 107. Renschler's construction of the building was subject to a written agreement with Pleasant. Although Renschler was contractually obligated to obtain some insurance, a project performance bond was not required.

¶ 108. Article 18 of the contract required Renschler to correct any defective work within one year from the date of substantial completion of the project. Article 20.3 contained additional warranties and representations wherein Renschler

> [warranted and represented] that the Building and the Work will be constructed in a good and workmanlike manner, . . . and, in particular, without limitation because of enumeration, Contractor warrant[ed] that the design and structural components of the Building, meaning without limitation the foundation, electrical, plumbing, walls, roof, floors, windows, doors and drives are free from defects.

¶ 109. The building was substantially completed on or about August 15, 1994, and by March of 1995, the

66

southeast corner of the building was beginning to sink. By April 3, 1995, it had sunk 8.5 inches, and it continued to sink, such that eventually the building had to be entirely dismantled. Because the contract between Renschler and Pleasant required arbitration, Pleasant sought arbitration. American Family, who issued the CGL policy to Renschler during the time the building was constructed and sank significantly, intervened in the arbitration, asked for a stay of the proceedings and filed the action now before this court to declare its obligations in regard to potential coverage.[2] On summary judgment, the circuit court concluded there was potential coverage under the CGL policy; the court of appeals reversed and we granted Renschler's petition for review.

## II. STANDARD OF REVIEW

¶ 110. We review decisions to grant summary judgment de novo, using the same standards applied by the circuit court and the court of appeals. *Guenther v. City of Onalaska,* 223 Wis. 2d 206, 210, 588 N.W.2d 375 (Ct. App. 1998). Additionally, we review an insurance policy as a question of law, *Vogel v. Russo,* 2000 WI 85, ¶ 14, 236 Wis. 2d 504, 613 N.W.2d 177, giving no deference to the circuit court. *See id.* We also decide whether the economic loss doctrine applies to a particular transaction as a matter of law. *Wausau Tile, Inc. v. County Concrete Corp.,* 226 Wis. 2d 235, 245–46, 593 N.W.2d 445 (1999).

---

[2] Because I agree with the majority's conclusions in regard to coverage for all other insurance policies at issue, I do not discuss them in this dissent.

## III. THE CGL POLICY

¶ 111. The interpretation of an insurance policy is governed by rules of construction that are similar to those applied to other contracts. *Vogel,* 236 Wis. 2d 504, ¶ 14. We review an insurance policy to determine whether the words and phrases used in the policy are susceptible to more than one reasonable construction. If they are, the terms are ambiguous. *Smith v. Atlantic Mut. Ins. Co.,* 155 Wis. 2d 808, 810–11, 456 N.W.2d 597 (1990). We construe an ambiguous policy as it would be understood by a reasonable insured. *Holsum Foods v. Home Ins. Co.,* 162 Wis. 2d 563, 568–69, 469 N.W.2d 918 (Ct. App. 1991). However, if the policy is not ambiguous, we will not rewrite it by construction to impose liability for a risk the insurer did not contemplate and for which it has not been paid. *Vogel,* 236 Wis. 2d 504, ¶ 14.

¶ 112. Because Renschler claimed for damages to the building that were caused by its sinking after construction, the question presented in this case is whether the continuation of known, unstable subsoil conditions that caused the building to sink was an "occurrence" thereby yielding potential coverage. *See Nichols v. American Employers Ins. Co.,* 140 Wis. 2d 743, 749–50, 412 N.W.2d 547 (Ct. App. 1987). That question is determined in part by whether Renschler could be "legally obligated to pay" a particular claim. Furthermore, the CGL policy applies to property damage "only if" it has been "caused by an occurrence," which is defined as an "accident," and no policy exclusion applies. No one has asserted these terms are ambiguous and we agree they are not.

## A. "Legally obligated to pay"

¶ 113. The American Family policy covers only those sums of money that Renschler is "legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies." Am. Fam. Policy, ¶ I.A.1. Pleasant asked for arbitration of claims sounding in tort (negligence) and in contract (breach of warranty). However, the parties agreed at oral argument that Pleasant has only a contract claim for breach of warranty.

¶ 114. Additionally, while the economic loss doctrine is not *directly* applicable to the insurance policy Renschler purchased from American Family, it is implicated in the coverage question because through the operation of the economic loss doctrine, Renschler cannot become "legally obligated to pay" Pleasant for a tort claim. *Wausau Tile,* 226 Wis. 2d at 245–46 (holding that the economic loss doctrine precludes a party to a contract from using tort theories of recovery for a claim based on the inferior quality of the object produced under the contract between the parties). "Repair and replacement costs are typical measures of economic loss." *Id.* at 248.

¶ 115. It is also important to note that in jurisdictions where suits for this type of loss are permitted as both contract and tort claims, success on the contract claim does not always result in success on the tort claim. *See Hartrick v. Great American Lloyds Ins. Co.,* 62 S.W.3d 270 (Texas App. 2001) (plaintiff sued for breach of warranty and negligent performance in preparing the soil and constructing a building, and the jury found for the plaintiff on the breach of warranty claim, but not on the negligence claim). Therefore, because Pleasant could not prevail on a negligence claim against

Renschler for this loss, the only damages Renschler could be found "legally obligated to pay" are those arising from a contract claim, here, breach of warranty. Accordingly, it is only the breach of warranty claim, *i.e.,* that Renschler contracted to correct the unstable subsoil conditions, which can be examined to determine whether there was an "occurrence."

## B. "Occurrence"

¶ 116. "Occurrence" is defined in the CGL policy as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." Am. Fam. Policy, ¶ V.9. The terms "occurrence" and "accident" have been reviewed by many Wisconsin courts. However, we have not previously decided whether the continuation of a known condition adverse to contract performance, which continuation results in property damage of a type that was likely to occur if the condition persisted, is an "accident."[3]

¶ 117. The majority bottoms its analysis of the "occurrence" issue in the following major premise: "No one seriously contends that the property damage to the [building] was anything but accidental (it was clearly not intentional), nor does anyone argue that it was anticipated by the parties." Majority op., ¶ 38. That assertion is contrary to the central argument American Family is making: Pleasant and Renschler, the parties

---

[3] I recognize that in *Wausau Tile, Inc. v. County Concrete Corporation,* 226 Wis. 2d 235, 269, 593 N.W.2d 445 (1999), we said that a breach of warranty was not an occurrence under a Traveler's insurance policy that employed the same definition of occurrence at issue there. However, the issue of whether a breach of warranty could be an occurrence was not disputed in *Wausau Tile.* It simply was assumed that a breach of warranty was not an accident. *Id.*

to the construction contract, recognized the risk that the subsoil might not be sufficient to support the building. As American Family points out, Pleasant, the purchaser of the completed building, was so aware of the possibility of the building settling that it secured a warranty from Renschler in which Renschler agreed to shoulder the risk of financial loss if settling occurred as a result of the continuation of the unstable subsoil conditions.

¶ 118. The majority's equation of "accidental" with "unintentional" begs the question presented here: whether the sinking of the building was an unforeseen event or one that resulted from an unknown cause. "Accident" is the operative word in the policy definition of "occurrence." An "accident" has been variously defined as:

> an event that takes place without one's foresight or expectation—an event that proceeds from an unknown cause, or is an unusual effect of a known cause, and therefore not expected.

10 *Couch on Insurance* § 139:14 (3d ed. 2000); or

> an event or condition occurring by chance or arising from unknown or remote causes . . . .

*Webster's Third New International Dictionary of the English Language, Unabridged* 11 (3d ed. 1961); or

> The word 'accident,' in accident policies, means an event which takes place without one's foresight or expectation. *A result, though unexpected, is not an accident; the means or cause must be accidental.* (Emphasis added).

*Black's Law Dictionary* 15 (7th ed. 1999). Here, the settling was not an unexpected outcome of construc-

tion. It was a known possibility. Furthermore, the settling did not take place due to an unknown cause. It was well recognized that the soil conditions were unfavorable to construction and if they continued there would be problems.

¶ 119. In sum, all the definitions of "accident" require, at a minimum, an unexpected event or an unexpected cause.[4] Here, it does not matter whether we focus on the sinking building or the continuation of unstable subsoil conditions, neither was unexpected. The unstable subsoil conditions were known and their correction required to prevent the building from sinking. In fact, the risk that the building would sink after construction was assumed by Renschler in its contract with Pleasant, showing a continuation of the unstable subsoil conditions was a potential and known risk of constructing the building on the site Pleasant chose.

¶ 120. Furthermore, we have equated "accident" with negligence. *Doyle v. Engelke,* 219 Wis. 2d 277, 289–90, 580 N.W.2d 245 (1998) (further citations omitted). However, negligence is a tort, and as we have earlier explained, Pleasant cannot sue Renschler for a tort. Therefore, if we use the definition in *Doyle,* there will be no coverage under the policy because Renschler will never be "legally obligated to pay" Pleasant based on negligence. *See Wausau Tile,* 226 Wis. 2d at 245–46.

¶ 121. Additionally, this analysis fits squarely within the purpose of a CGL policy. It is written to cover the risks of injury to third parties and damage to the property of third parties caused by the insured's com-

---

[4] It could be argued that both an unexpected event and an unexpected cause are required to constitute an accident. Because in this case neither the sinking of the building nor the cause of the sinking was unexpected, I do not address it.

pleted work. It is not written to cover the business risk of failing to provide goods or services in a workmanlike manner to the second party to the contract. L.B. Foster, *Point/Counterpoint: No Coverage under the CGL Policy for Standard Construction Defect Claims*, 22 Spg. Construction Law., 18; *Bulen v. West Bend Mut. Ins. Co.*, 125 Wis. 2d 259, 264–65, 371 N.W.2d 392 (Ct. App. 1985).

¶ 122. And finally, the happening of an accident is entirely unpredictable; by its very definition, it is not something one can plan to occur. Therefore, a contractor would have difficulty budgeting to meet that risk; hence the need for insurance. However, here, the risk that the unstable subsoil conditions would continue was a known risk. If Renschler did not want to shoulder that risk, it could have required a performance bond or a warranty from Lawson similar to the one Pleasant obtained from it.

¶ 123. The majority also asserts that if contract claims are never "occurrences" then there is no need to have the business risk exclusion. Majority op., ¶ 47. That argument ignores the fact that the policy at issue is a standard CGL policy. It is issued to many contractors to cover myriad circumstances that may be very dissimilar from the facts that form the basis for Pleasant's claim. Therefore, in a claim based on different facts, there may be an occurrence and yet the business risk exclusion may preclude coverage. For example, if a contractor builds a building and a wall spontaneously collapses on a passer-by because of poor workmanship in constructing the wall, there would be an occurrence in regard to the unforeseen falling of the wall, and the damage to the injured person would be

covered. However, the repair of the defective wall would be excluded from coverage under the business risk exclusion.

¶ 124. The majority also relies on reasoning similar to the court of appeals opinion in *Kalchthaler v. Keller Construction Company,* 224 Wis. 2d 387, 591 N.W.2d 169 (Ct. App. 1999), for its conclusion that the damage to the building was caused by an occurrence because the damage was accidental. Majority op., ¶¶ 48–49. In *Kalchthaler,* the building that Keller constructed had faulty windows that leaked and caused damage to other parts of the building. The court began its analysis by recognizing that it had decided in *Bulen* that there is a difference between an "accident of faulty workmanship" and "faulty workmanship that causes an accident." *Kalchthaler,* 224 Wis. 2d at 395–96 (citing *Bulen,* 125 Wis. 2d at 265). However, *Kalchthaler* discarded that distinction by mixing tort elements with contract elements based on the parties' stipulation that a tort had occurred and by failing to focus on whether faulty workmanship was an "accident":

> [The parties] stipulated that fifty percent of the damages were due to Keller's negligence. Furthermore, there is no question that an event occurred: the windows leaked. This is an accident. So we have property damage caused by an occurrence and the policy applies.

*Kalchthaler,* 224 Wis. 2d at 397. Here, there can be no finding that Renschler was negligent. Both the economic loss doctrine and the parties' statements to the court at oral argument preclude it.

¶ 125. In my view, this court correctly interpreted the reasonable expectation of an insured under a CGL policy in *Vogel,* where we acknowledged the differing

74

expectations that an insured has in purchasing a CGL policy and a performance bond. We explained:

> A CGL policy's sole purpose is to cover the risk that the insured's goods, products, or work will cause bodily injury or damage to property *other than* the product or the completed work of the insured. . . . A CGL policy, therefore, is not a performance bond.

*Vogel*, 236 Wis. 2d 504, ¶ 17 (emphasis in original) (additional citations omitted). The majority tries to limit the usefulness of *Vogel* by saying it should not "be read for the conclusion that a loss actionable in contract rather than tort can never constitute a covered 'occurrence' under a CGL policy." Majority op., ¶ 43. But, its statement misses the heart of *Vogel*, which was based on long-standing precedent that has held that faulty workmanship is not covered under a CGL policy. *See Wisconsin Label Corp. v. Northbrook Prop. & Cas. Ins. Co.*, 2000 WI 26, ¶ 58, 233 Wis. 2d 314, 607 N.W.2d 276; *St. John's Home of Milwaukee v. Continental Cas. Co.*, 147 Wis. 2d 764, 788–89, 434 N.W.2d 112 (Ct. App. 1988); *Bulen*, 125 Wis. 2d at 264–65; *Jacob v. Russo Builders*, 224 Wis. 2d 436, 446–47, 592 N.W.2d 271 (Ct. App. 1999). And finally, this interpretation is not just the opinion of the dissent, but it is also the opinion of the majority of courts that have addressed this question. *See* Foster, *supra,* at ¶ 18.

¶ 126. Accordingly, I conclude that under the facts of this case, there was no occurrence, and from that it follows that there is no coverage.

¶ 127. For the foregoing reasons I respectfully dissent.

¶ 128. I am authorized to state that Justice N. PATRICK CROOKS joins this dissent.