**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 07-1528**

RACE CITY FASTENERS, INCORPORATED,

            Plaintiff - Appellee,

      v.

SELECTIVE INSURANCE COMPANY OF SOUTH CAROLINA,

            Defendant - Appellant.

Appeal from the United States District Court for the Western District of North Carolina, at Statesville.  Richard L. Voorhees, District Judge.  (5:05-cv-00009)

Argued:  March 20, 2008              Decided:  May 21, 2008

Before TRAXLER, Circuit Judge, HAMILTON, Senior Circuit Judge, and David R. HANSEN, Senior Circuit Judge of the United States Court of Appeals for the Eighth Circuit, sitting by designation.

Affirmed by unpublished per curiam opinion.

**ARGUED:** Susan K. Burkhart, CRANFILL, SUMNER & HARTZOG, L.L.P., Raleigh, North Carolina, for Appellant.  Mark A. Michael, Charlotte, North Carolina, for Appellee.  **ON BRIEF:** Robert C. Gunst, Sr., GUNST & GUNST, Charlotte, North Carolina, for Appellee.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Race City Fasteners, Inc. (Race City) filed this declaratory judgment action seeking a declaration that Selective Insurance Company of South Carolina (Selective) is required to pay it damages under a Commercial General Liability Policy (the Selective CGL Policy or the Policy) issued to Plasfab, Inc. (Plasfab), for a default judgment in the amount of $714,414.96 obtained by Race City against Plasfab. On cross-motions for summary judgment, the district court granted summary judgment in toto in favor of Race City. This timely appeal followed. We affirm.

I.

Race City, a North Carolina corporation, was formerly in the business of anodizing engine parts especially designed for Nascar racing.[1] Plasfab is a Rhode Island corporation, which prior to filing Chapter 7 bankruptcy in February 2004, was in the business of the design, development, fabrication, and installation of manual and automated metal finishing systems. Relevant to the present appeal, Race City purchased an anodizing line from Plasfab to anodize metal pistons on a mass basis, i.e., at least 1000 per week, and to certain specifications that would allow the pistons to

_____

[1]Although Race City maintains its corporate status, it no longer operates as an active business.

- 2 -

be used in racing engines.[2]  Plasfab installed the anodizing line in June 2001, at Race City's facility in Mooresville, North Carolina.  Race City paid Plasfab the contract price of $290,000.00.

On January 9, 2003, Race City filed a complaint against Plasfab in the United States District Court for the Western District of North Carolina (the Underlying Complaint).  Relevant to the issues on appeal, the Underlying Complaint alleged as follows:

6.     During the course of discussions and negotiations which led to Race City's purchase of an anodizing line from Plasfab, Race City specifically advised Plasfab of its requirements for such a line.  In particular, Race City specifically advised Plasfab that it needed a line to mass produce anodized pistons, at least 1000 per week, that such pistons would have to be anodized to specifications such that they could be used in racing engines and that any line it purchased would need to be compatible with a computerized control system offered by Metalast, a Nevada corporation with which Race City had ongoing discussions as to the project.

---

[2]     "According to testimony provided in the underlying action by Ron Anderson, consultant for Race City, 'Anodizing is an electrochemical process by which we apply electricity to an acid bath and it deliberately rusts the aluminum, changing it from aluminum to aluminum oxide.'  (8/19/03 Hr'g Tr. at 3.)  The [a]nodizing process was used by Race City to harden the area of the piston exposed to the most temperature and heat for engine combustion processes so that the aluminum of the piston does not stick to the ring.  (Hr'g Tr. at 4-5.)."

(J.A. 626 n.2, District Court's final Memorandum Opinion and Order).

* * *

9.   The anodizing line was designed, manufactured and installed by Plasfab. Race City relied entirely and specifically on the expertise of Plasfab to produce a line which would work as specified.

10.  The line was installed in June of 2001 by Plasfab at the Race City facility in Mooresville, North Carolina, and Race City paid the contract price.

11.  Based on the specific representation of Plasfab that its line would work as required with the Metalast control system, and in reliance thereon, Race City entered into a License Agreement with Metalast for the use of its proprietary control system.

12.  Race City also incurred substantial other expenses in connection with the line, including the salary of an employee hired to operate the line, the cost of chemicals and other supplies, the cost of unfinished pistons purchased to be anodized, and various other items as the evidence will show.

13.  While the line was being developed, manufactured, installed and tested, Race City contacted numerous prospective customers for the piston anodizing services. The response of these prospective customers was uniformly positive, and some of these prospective customers actually sent pistons to Race City to be anodized on a test basis. . . .

14.  All of these efforts and expenses came to nothing. The line furnished by Plasfab does not work as promised and, on information and belief, cannot be made to work as promised. Although the line is capable of anodizing pistons, it can do so only on an extremely limited basis.

15.  After the line was installed and set up, Race City employees, working with Metalast and Plasfab personnel, spent months attempting to make the line work as promised. Despite all these efforts, the line has never successfully mass produced anodized pistons. In fact, the highest number of pistons which met specifications for any one anodizing

cycle and which could be sold by Race City has been two, as opposed to the promised 1000 per week.

(J.A. 319-21).

Based upon these allegations, Race City alleged four claims in the Underlying Complaint: (1) breach of contract; (2) breach of express warranty; (3) breach of implied warranties; and (4) negligent design and manufacture. With respect to the negligence claim, the Underlying Complaint alleged:

As a direct and proximate result of this negligence, Race City has suffered damages including the contract price, installation and operating expenses and the cost of supplies and unfinished pistons. As noted above, pistons furnished by third parties were anodized and made useless and of no value using the Plasfab line.

(J.A. 321) (emphasis added).

On the afternoon of February 24, 2003, Plasfab tendered the Underlying Complaint to Selective for defense under the Selective CGL Policy. On the morning of February 26, 2003, Selective denied Plasfab a defense and disclaimed any coverage under the Policy. At the conclusion of default judgment proceedings before the district court, on August 26, 2003, the district court entered a default judgment against Plasfab in the amount of $714,414.96 (the Underlying Action).[3]

Plasfab filed for Chapter 7 bankruptcy in February 2004. Race City, standing in the shoes of Plasfab, subsequently filed the

[3]The same district court judge who presided in the Underlying Action also presided over the present declaratory judgment action.

- 5 -

present declaratory judgment action against Selective, seeking a declaration that Selective is required to satisfy the $714,414.96 default judgment pursuant to the Selective CGL Policy.

At this point, we set forth certain language of the Selective CGL Policy, which is at issue on appeal.[4] The initial coverage clause provides, in relevant part:

> We will pay those sums that the insured becomes legally obligated to pay as damages because of . . . "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for . . . "property damage" to which this insurance does not apply.

(J.A. 210). The Policy only affords coverage for property damage caused by an "occurrence" that takes place in the coverage territory and during the policy period. Id.

The Policy defines "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." (J.A. 222). The Policy Defines "property damage" as:

> a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

---

[4]The Selective CGL Policy is a standard 1994 commercial general liability policy form drafted by the Insurance Services Office, Incorporated (ISO). ISO forms are widely used in the insurance industry. See French v. Assurance Co. of Am., 448 F.3d 693, 697 (4th Cir. 2006).

> b. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

(J.A. 223).

In its Memorandum Opinion and Order granting summary judgment in favor of Race City, the district court's analysis went as follows: (1) Rhode Island law applied to resolve the substantive legal issues in the case; (2) along with other allegations providing context, the allegation of the negligence claim set forth in the Underlying Complaint that "pistons furnished by third parties were anodized and made useless and of no value using the Plasfab line," (J.A. 321), alleged property damage, specifically physical injury, caused by an occurrence within the Policy language; (3) because the Underlying Complaint included allegations that alerted Selective that one of the claims asserted might potentially fall within the Policy coverage, Selective breached its duty under the Policy to defend Plasfab in the Underlying Action; (4) under <u>Conanicut Marine Servs., Inc. v. Ins. Co. of North Am.</u>, 511 A.2d 967 (R.I. 1986), Selective's breach of its duty to defend makes it liable for the full amount of the default judgment; and (5) under <u>Lavender v. State Farm Mut. Auto. Ins. Co.</u>, 450 S.E.2d 34 (N.C. Ct. App. 1994), and the third-party beneficiary doctrine, Race City possessed the very same rights under the Policy as Plasfab, and therefore, Race City may assert an estoppel defense against Selective. Although the district court held that Rhode

Island law governed the substantive legal issues in the case, it stated that "[i]t appears there is no difference on any substantive point of law between North Carolina and Rhode Island law. The Court also looks to North Carolina law for guidance." (J.A. 629 n.3, District Court's final Memorandum Opinion and Order).

This timely appeal by Selective followed.


II.

We review <u>de novo</u> the district court's grant of summary judgment in favor of Race City, applying the same standard as did the district court and construing the facts in the light most favorable to Selective, the nonmoving party. <u>See</u> <u>Holland v. Washington Homes, Inc.</u>, 487 F.3d 208, 213 (4th Cir. 2007). Summary judgment is appropriate when the evidence demonstrates that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).


III.

The first issue on appeal is whether the Underlying Complaint contained allegations triggering a duty to defend on the part of Selective under the Policy. The parties agree that Rhode Island law controls the substantive legal issues in this case. Under Rhode Island law, an insurer's duty to defend under a liability policy is broader than its duty to indemnify. <u>Mellow v. Medical</u>

Malpractice Joint Underwriting Assn. of R.I., 567 A.2d 367, 368 (R.I. 1989).  Under Rhode Island law, it is well established that an insurer's duty to defend under a liability policy is triggered when factual allegations contained in the underlying complaint raise a reasonable possibility of coverage, regardless of whether the plaintiff in the underlying tort action prevails on the merits. Hingham Mut. Fire Ins. Co. v. Heroux, 549 A.2d 265, 266 (R.I. 1988) ("As a general principle, this court will find that a duty to defend arises when the complaint in the underlying tort action contains facts sufficient to bring the case within or potentially within the coverage of the policy, regardless of whether the plaintiffs in the tort action will prevail on the merits.").  Any doubts as to whether the underlying complaint alleges an event covered under the policy must be resolved in favor of the insured. Allstate Ins. Co. v. Russo, 641 A.2d 1304, 1306 (R.I. 1994).

As previously stated, the district court held that along with other allegations providing context, the allegation of the negligence claim set forth in the Underlying Complaint that "pistons furnished by third parties were anodized and made useless and of no value using the Plasfab line," (J.A. 321), alleged property damage (specifically physical injury to the pistons furnished by the third parties) caused by an occurrence, within the Policy language.

In challenge to this holding, Selective primarily argues that, while the Underlying Complaint alleged that the customers' pistons were made useless, the Underlying Complaint never directly alleges that the customers' pistons were physically damaged nor that the pistons failed to meet contract specifications. Race City responds that anodizing metal is a physical process, and therefore, when the Underlying Complaint alleges that the "pistons furnished by third parties were anodized and made useless and of no value using the Plasfab line," (J.A. 321), the Underlying Complaint is alleging physical injury to tangible property of third parties.

We agree with Race City. Under a reasonable reading of the entire Underlying Complaint, and in particular the allegation just quoted regarding the pistons having no value, the Underlying Complaint alleged physical injury to tangible property of third parties within the language of the Policy. The import of the allegations is that the anodizing process applied to the pistons supplied by Race City's customers was not successful, and therefore, physically damaged such pistons. The pistons were no longer in their unanodized state such that they could still be properly anodized, nor were they in an anodized state to the degree necessary to be useful. The situation is analogous to the botched carving of a person's name and address in a piece of wood intended to be a sign. If the person's name is misspelled or the address is incorrectly stated, the wood is physically damaged and of no use

- 10 -

for its intended purpose of correctly displaying the person's name and address.

Selective also argues that from a fair reading of the Underlying Complaint, it would have no reason to believe that Race City had reimbursed its customers for their damaged pistons in the care, custody and control of Race City, thereby suffering actual damage itself, since recovery of such reimbursement should be alleged as a claim for indemnity or contribution. In support, Selective relies on an unpublished Ninth Circuit case, <u>Seagate Technology, Inc. v. St. Paul Fire & Marine Ins. Co.</u>, 1995 WL 759217 (9th Cir. Dec. 22, 1995) (unpublished).

Selective's argument is without merit. As long as the allegations in the Underlying Complaint recite facts bringing the damages alleged within the coverage of the Policy, Selective had a duty to defend Plasfab regardless of Plasfab's ultimate liability to Race City. <u>Progressive Cas. Ins. Co. v. Narragansett Auto Sales</u>, 764 A.2d 722, 724 (R.I. 2001) (pleadings test "requires the trial court to look at the allegations contained in the complaint and if the pleadings recite facts bringing the injury complained of within the coverage of the insurance policy, the insurer must defend irrespective of the insured's ultimate liability to the plaintiff") (internal quotation marks omitted). <u>Cf.</u> <u>American Fam. Mut. Ins. Co. v. American Girl, Inc.</u>, 673 N.W.2d 65, 77 (Wis. 2004)

(standard CGL policy's basic coverage language does not distinguish between losses actionable in tort or actionable in contract).

Of relevance, the negligence claim in the Underlying Complaint alleged:

> As a direct and proximate result of this negligence, Race City has suffered damages including the contract price, installation and operating expenses and the cost of supplies and unfinished pistons. As noted above, pistons furnished by third parties were anodized and made useless and of no value using the Plasfab line.

(J.A. 321) (emphasis added). Contrary to Plasfab's position, from a fair reading of these allegations, along with other allegations in the Underlying Complaint, one can reasonably infer that Race City incurred expenses proximately caused by Plasfab's negligence in the form of reimbursing its customers for the cost of the pistons such customers had put in Race City's care, custody, and control for the purpose of being anodized by the new Plasfab anodizing line, but were nonetheless improperly anodized. This circumstance materially distinguishes the present case from Seagate, in which the underlying complaint could not be fairly read to allege that the underlying plaintiff had actually incurred expenses in the form of reimbursement to its customers for property damage caused by the insured. Seagate, 1995 WL 759217 at *2.

In sum, the district court correctly held that, along with other allegations that provided context, the allegations of the negligence claim set forth in the Underlying Complaint that "pistons furnished by third parties were anodized and made useless

- 12 -

and of no value using the Plasfab line," (J.A. 321), alleged property damage caused by an occurrence, within the Policy language.[5]

IV.

In the next and final issue on appeal, Selective argues that, assuming arguendo Plasfab was liable to Race City for its costs in reimbursing its customers for their damaged pistons used in the testing process, its (Selective's) liability should be limited to $11,601.40.[6] In its opening brief "Selective acknowledges that," under Conanicut, 511 A.2d at 967, "if an insurer improperly denies a defense to an insured[,] an insured can recover the costs of a settlement or judgment as damages for the insurer's breach of contract in failing to defend the insured," but argues that this

---

[5]In its appellate briefing, Selective argued that five separate coverage exclusions in the Policy independently applied to bar coverage of any damage to the test pistons provided to Race City by third parties, and therefore, operated to defeat any duty to defend Plasfab under the Policy in connection with such allegedly damaged pistons. However, in response to specific questioning from the bench at oral argument, counsel for Selective expressly stated that Selective was only arguing that Exclusion b., which excludes coverage for damages "for which the insured is obligated to pay damages by reason of the assumption of liability in a contract agreement," applied to defeat its duty to defend Plasfab in connection with damage to the test pistons provided to Race City by its customers. Selective's argument regarding the application of Exclusion b. is without merit.

[6]Race City does not dispute Selective's assertion that its costs in reimbursing its customers for their damaged pistons used in the testing process amounted to $11,601.40.

rule does not operate in favor of a stranger to the Policy, such as Race City.[7] (Selective's Opening Br. at 25). The rationale for the rule in <u>Conanicut</u> is that the insurance company could have avoided the entire problem simply by defending its insured under a reservation of rights or by bringing a declaratory judgment action against its insured on the question of coverage. <u>Conanicut</u>, 511 A.2d at 971 n.10.

The fatal problem with Selective's argument that Race City, as a stranger to the Policy, cannot avail itself of the rule in <u>Conanicut</u>, is that a specific Rhode Island statute, as construed by the Rhode Island Supreme Court, grants Race City the right to proceed directly against Selective as if standing in the shoes of

---

[7]We note that Selective, in its Reply Brief, relies upon <u>Emhart Indus., Inc. v. Home Ins. Co.</u>, 515 F. Supp. 2d 228 (D.R.I. Sept. 26, 2007), to argue that <u>Conanicut</u> is no longer good law. Having already expressly acknowledged the continued vitality of <u>Conanicut</u> in its Opening Brief, Selective cannot be heard to argue otherwise by raising such argument for the first time in its Reply Brief. <u>See</u> Fed. R. App. P. 28(a)(9)("[T]he argument [section of appellant's brief] . . . must contain . . . appellant's contentions and the reasons for them, with citations to the authorities and parts of the record on which the appellant relies."); <u>Yousefi v. INS</u>, 260 F.3d 318, 326 (4th Cir. 2001) (alien petitioner waived argument on appeal raised for the first time in his reply brief by failing to raise it in his opening brief). This is so despite the fact that <u>Emhart</u> was issued after Selective filed its Opening Brief, because all of the cases and rationales that the district court in <u>Emhart</u> relied upon to predict that the Rhode Island Supreme Court would not apply <u>Conanicut</u> to the facts before it were available to Selective at the time that Selective filed its Opening Brief. Accordingly, this is not a situation where a Rhode Island appellate court cast doubt upon the continued validity of <u>Conanicut</u> after Selective had filed its opening brief. Moreover, without going into detail, we note that the facts of <u>Emhart</u> are quite distinguishable from the case at hand.

Plasfab.  Rhode Island General Laws § 27-7-2 provides, in relevant part:  "The injured party, . . . after having obtained judgment against the insured alone, may proceed on that judgment in a separate action against the insurer . . . ."  R. I. Gen. L. § 27-7-2.  The Rhode Island Supreme Court has held that, for purposes of this statute, the injured party (i.e., judgment creditor) stands in the shoes of the insured (i.e., judgment debtor).  Ogunsuada v. General Acc. Ins. Co. of Am., 695 A.2d 996, 1000 (R.I. 1997).

While Selective argues that Race City, as a third-party beneficiary of the Policy, is not able to assert any estoppel rights that Plasfab may have against it (i.e., Selective) and argues that an antiassignment clause in the Policy operates to limit Race City to a third-party beneficiary status, the bottom line is that § 27-7-2 is dispositive on the matter.  Rhode Island General Laws § 27-7-2, as interpreted by the Rhode Island Supreme Court in Ogunsuada, permits Race City to sue Selective in a derivative capacity, which means that Race City stands in the shoes of Plasfab for purposes of the present declaratory judgment action against Selective.  We note that the district court did not rely upon § 27–7-2 in rejecting Selective's arguments on this issue, but instead, relied upon North Carolina case law regarding third-party beneficiary status.  This fact is of no moment, because Selective expressly agrees that Rhode Island law governs all substantive legal issues in this case.

- 15 -

In sum, the district court did not err in granting summary judgment in favor of Race City.[8]

V.

In conclusion, we affirm the district court's entry of judgment in favor of Race City.

AFFIRMED

---

[8]We note that Selective does not dispute that the default judgment award of $714,414.96 is within the Policy's property damage limit.

- 16 -