Isaac Sawyer, d/b/a A-1 Security Locksmiths, Plaintiff-Respondent,

v.

West Bend Mutual Insurance Company, Defendant-Appellant,†

Atlas Heating and Sheet Metal Works, Inc., Defendant-Respondent.

Court of Appeals

*No. 2011AP902. Oral argument May 8, 2012.*
*—Decided July 10, 2012.*

2012 WI App 92

(Also reported in 821 N.W.2d 250.)

† Petition for Review granted 11/14/12.

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Jeffrey L. Leavell* and *Timothy L. Pagel* of *Jeffrey Leavell, S.C.*, of Racine, with oral argument by *Jeffrey L. Leavell*.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *Charles H. Barr* of *Croen &*

*Barr LLP*, of Milwaukee, with oral argument by *David M. Oppenheim, pro hac vice*, of *Anderson & Wanca*, Rolling Meadows, IL.

Before Curley, P.J., Fine and Brennan, JJ.

¶ 1. CURLEY, P.J. West Bend Mutual Insurance Company (West Bend) appeals the grant of summary judgment to Isaac Sawyer, doing business as A-1 Security Locksmiths (A-1 Security), on the issue of whether the insurance policy West Bend issued to defendant Atlas Heating and Sheet Metal Works, Inc. (Atlas) provides coverage under its "personal and advertising injury" provision for privacy violations stemming from an unsolicited "junk" fax, as alleged in Sawyer's complaint against Atlas.[1] West Bend argues the policy should not be construed to cover damages from Atlas's unsolicited fax because: (1) the policy solely covers individual privacy rights, and plaintiff A-1 Security is a business; (2) the complaint does not allege facts describing a privacy violation covered by the policy's "personal and advertising injury" provision; and (3) there has been no "publication" of the fax as required by the policy. In the alternative, West Bend argues that even if there is coverage, it is excluded under the policy's "Knowing Violation of Rights of Another" exclusion. For reasons we discuss below, we affirm.

## BACKGROUND

¶ 2. On or around December 9, 2005, Atlas sent an unsolicited "junk" fax advertisement to Sawyer's business, A-1 Security. The advertisement was printed by A-1 Security's fax machine, using its paper and its

---

[1] The court heard argument on this case on May 8, 2012.

toner. Sawyer had not given Atlas express invitation or permission to fax advertisements, nor did Sawyer have a business relationship with Atlas.

¶ 3. Consequently, Sawyer initiated a class action against Atlas, alleging that Atlas violated the federal Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227,[2] by sending the "junk" fax to his place of business

---

[2] 47 U.S.C. § 227(b)(1) prohibits sending unsolicited advertisements using a facsimile machine. It provides, in pertinent part:

It shall be unlawful for any person within the United States . . .

(C) to use any telephone facsimile machine, computer, or other device to send, to a telephone facsimile machine, an unsolicited advertisement, unless—

(i) the unsolicited advertisement is from a sender with an established business relationship with the recipient;

(ii) the sender obtained the number of the telephone facsimile machine through—

(I) the voluntary communication of such number, within the context of such established business relationship, from the recipient of the unsolicited advertisement, or

(II) a directory, advertisement, or site on the Internet to which the recipient voluntarily agreed to make available its facsimile number for public distribution, except that this clause shall not apply in the case of an unsolicited advertisement that is sent based on an established business relationship with the recipient that was in existence before July 9, 2005, if the sender possessed the facsimile machine number of the recipient before such date of enactment; and

(iii) the unsolicited advertisement contains a notice meeting the requirements under paragraph (2)(D), except that the exception under clauses (i) and (ii) shall not apply with respect to an unsolicited advertisement sent to a telephone facsimile machine by a sender to whom a request has been made not to send future unsolicited advertisements to such telephone facsimile machine that complies with the requirements under paragraph (2)(E); or

as well as to thousands of others. Specifically, Sawyer claimed that Atlas was responsible for damages to his physical property because the junk fax consumed paper, toner, and caused general wear and tear to the fax machine. Sawyer also alleged that Atlas was responsible for damages for personal and advertising injury because the receipt of the unsolicited junk fax violated his right to privacy. The class action, originally filed in Milwaukee County Circuit Court, was removed to the Eastern District of Wisconsin based on federal question jurisdiction, and has been stayed pending resolution of the insurance coverage issue addressed in this court.

¶ 4. Sawyer also sued West Bend, Atlas's insurer. The West Bend policy, which was in effect when Atlas faxed the unsolicited advertisement, included general liability coverage for damages incurred by Atlas due to: (1) "property damage" caused by an "occurrence" and (2) "personal and advertising injury." The "personal and advertising injury" coverage contained a provision excluding coverage if the personal and advertising injury was "caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict 'personal and advertising injury.' "

¶ 5. As pertinent to this appeal, Sawyer brought an action for declaratory judgment against Atlas and West Bend in the Milwaukee County Circuit Court to determine whether West Bend had a duty to defend and/or indemnify Atlas. The trial court determined that West Bend did not have a duty to defend or indemnify Atlas under the "property damage" provision of the

---

(D) to use an automatic telephone dialing system in such a way that two or more telephone lines of a multi-line business are engaged simultaneously.

policy, but it did have a duty to defend Atlas under the "personal and advertising injury" provision of the policy.

¶ 6. The "Personal and Advertising Injury Liability" provision of the policy provided, in pertinent part: "We will pay those sums that the insured becomes legally obligated to pay as damages because of 'personal and advertising injury' to which this insurance applies." The policy defined "personal and advertising injury" in pertinent part as: "injury, including consequential 'bodily injury,' arising out of one or more of the following offenses: ... [o]ral or written publication, in any manner, of material that violates a person's right of privacy."

¶ 7. The "knowing violation of rights of another" exclusion provided, in pertinent part, that the insurance did not apply to: " '[p]ersonal and advertising injury' caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict 'personal and advertising injury.' "

¶ 8. The trial court concluded that the plaintiff in the case was Sawyer as an individual and that his individual right to privacy was violated. The trial court also concluded that the language of the policy was ambiguous and consequently needed to be construed in favor of the insured. Specifically, the trial court deduced that the word "privacy" should include the right to seclusion. Additionally, the trial court concluded that the faxed advertisement was a "publication." Finally, the court held that the "knowing violation of rights of another" exclusion did not apply here because the allegations in the complaint provided for the possibility that Atlas may not have had the requisite knowledge that it was violating Sawyer's right of privacy; in other words, Atlas may have negligently, and not intentionally, violated Sawyer's right of privacy. West Bend now appeals.

## ANALYSIS

*Standard of Review*

¶ 9. Summary judgment is appropriate when determining insurance policy coverage. *Home Ins. Co. v. Phillips*, 175 Wis. 2d 104, 109, 499 N.W.2d 193 (Ct. App. 1993). We review a grant of summary judgment independently, applying the standards set forth in Wis. Stat. § 802.08(2) (2009–10),[3] in the same manner as the trial court. *See Danbeck v. American Family Mut. Ins. Co.*, 2001 WI 91, ¶ 9, 245 Wis. 2d 186, 629 N.W.2d 150. Summary judgment is appropriate if the material facts are undisputed and "the moving party is entitled to judgment as a matter of law." § 802.08(2). Additionally, "[t]he interpretation of an insurance contract is a question of law subject to *de novo* review." *Danbeck*, 245 Wis. 2d 186, ¶ 10 (emphasis added). Here, the only issue is whether West Bend has a duty to defend Atlas against Sawyer's federal suit. Because there are no material facts in dispute, we are presented with a question of law, which we review *de novo*. *See Radke v. Fireman's Fund Ins. Co.*, 217 Wis. 2d 39, 42–43, 577 N.W.2d 366 (Ct. App. 1998).

¶ 10. Key to our determination is the rule that an insurer has a duty to defend as long as coverage is arguable or fairly debatable. *Southeast Wis. Prof'l Baseball Park Dist. v. Mitsubishi Heavy Indus. Am., Inc.*, 2007 WI App 185, ¶ 41, 304 Wis. 2d 637, 738 N.W.2d 87. Whether an insurer has a duty to defend the insured is determined by the complaint without looking to extrinsic

---

[3] All references to the Wisconsin Statutes are to the 2009–10 version unless otherwise noted.

evidence. *Grube v. Daun*, 173 Wis. 2d 30, 72, 496 N.W.2d 106 (Ct. App. 1992). Wisconsin applies the four-corners rule, which provides that the insurer must defend its insured when the facts alleged in the four corners of the complaint, if proven, would constitute a covered claim. *See Estate of Sustache v. American Family Mut. Ins. Co.*, 2008 WI 87, ¶ 27, 311 Wis. 2d 548, 751 N.W.2d 845. The duty to defend depends solely on the nature of the claim, regardless of the claim's merits, and any doubts are resolved in favor of the insured. *Elliott v. Donahue*, 169 Wis. 2d 310, 321, 485 N.W.2d 403 (1992).

¶ 11. General principles of contract construction control insurance contract interpretation. *Maas by Grant v. Ziegler*, 172 Wis. 2d 70, 79, 492 N.W.2d 621 (1992). Because the primary goal is to determine and carry out the intent of the parties, the language of the policy is interpreted how "a reasonable person in the position of the insured would have understood the words to mean." *See Sprangers v. Greatway Ins. Co.*, 182 Wis. 2d 521, 536, 514 N.W.2d 1 (1994). Words are given their common and ordinary meaning. *Folkman v. Quamme*, 2003 WI 116, ¶ 17, 264 Wis. 2d 617, 665 N.W.2d 857. If the policy language is plain and unambiguous, it is enforced as written. *Danbeck*, 245 Wis. 2d 186, ¶ 10. However, if the policy language is susceptible to more than one reasonable meaning, it is considered ambiguous and construed in favor of coverage. *Id.*

*(1) West Bend's policy covers damages from Atlas's unsolicited fax.*

¶ 12. On appeal, West Bend provides three reasons why the policy should not be construed to cover damages from Atlas's unsolicited fax: (1) the policy

723

covers only individual privacy rights, and the plaintiff in this case, A-1 Security, is a business; (2) the complaint does not allege facts describing a privacy violation covered by the policy's "personal and advertising injury" provision; and (3) there has been no "publication" of the fax as required by the policy. We discuss each argument in turn.

> *(a) The policy covers Sawyer individually and doing business as A-1 Security.*

¶ 13. West Bend first argues that, because the policy language at issue refers to a publication that violates a person's right to privacy, it does not cover damages suffered by Sawyer, who is listed on the complaint as doing business as "A-1 Security Locksmiths." West Bend argues that because a separate clause in the policy—the clause that provides coverage for personal and advertising injury involving slander and libel—explicitly includes coverage when a "person or organization" is injured, the clause at issue can only be construed to apply to individuals, not businesses. *See Bulen v. West Bend Mut. Inc. Co.*, 125 Wis. 2d 259, 263, 371 N.W.2d 392 (Ct. App. 1985) (we will not read policies to render words superfluous).

¶ 14. We disagree based on the facts alleged in the complaint. *See Estate of Sustache*, 311 Wis. 2d 548, ¶¶ 20, 27. Sawyer, as an individual and on behalf of other individuals, brought this action against West Bend, and therefore, there is coverage. Although the blast fax was sent to Sawyer's place of business, A-1 Security, and used its fax machine, toner, and paper, Sawyer received the fax and brought the class action

suit against West Bend "on behalf of himself and all other persons similarly situated." Sawyer is listed as the plaintiff in the complaint, and it is he—as a natural person—who is seeking relief for the TCPA violation.

¶ 15. Moreover, we do not agree with West Bend that A-1 Security is not a "person" as contemplated by the policy. As noted, words in an insurance policy are given their common and ordinary meaning to determine whether they are ambiguous, *Folkman*, 264 Wis. 2d 617, ¶ 17, and if a word in an insurance contract is susceptible to more than one reasonable meaning, it is considered ambiguous and should be construed in favor of coverage, *Danbeck*, 245 Wis. 2d 186, ¶ 10. The policy does not define the word "person," so we must give it its common and ordinary meaning. *See Folkman*, 264 Wis. 2d 617, ¶ 17. And, as Sawyer correctly notes, "person" is defined as a business in many contexts. For example, WEBSTER'S NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE 1686 (3d ed. 1993) includes in its definition of "person" "a human being, a body of persons, or a corporation, partnership, or other legal entity that is recognized by law as the subject of rights and duties," and BLACK'S LAW DICTIONARY 1178 (8th ed. 2004) includes in its definition of "person" "an entity, (such as a corporation) that is recognized by law as having the rights and duties of a human being." Additionally, WIS. STAT. § 990.01(26) and 1 U.S.C. § 1 both include corporate entities in their definitions of "person." Therefore, given its common and ordinary meaning, the word "person" applies to A-1 Security.

¶ 16. Furthermore, we do not agree with West Bend that the use of both "person" and "organization" in the clause that provides coverage for personal and advertising injury involving slander and libel means that defining "person" to include businesses in the

725

section at issue would render using the word "organization" superfluous. *See Bulen*, 125 Wis. 2d at 263. As noted, the policy does not define "person," and it does not define "organization." The common definitions of both words, however, include businesses. For example, as noted above, WEBSTER'S, BLACK'S, the Wisconsin Statutes, and the United States Code all include businesses as "persons." Similarly, WEBSTER'S includes in its definition of "organization" "a state or manner of being organized . . . as a business, political party, military unit . . . including the established relationships of personnel through lines of authority and responsibility with delegated and assigned duties." *See* WEBSTER'S NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE 1590. BLACK'S includes in its definition of "organization" "a body of persons (such as a union or corporation) formed for a common purpose." *See* BLACK'S LAW DICTIONARY 1133. Therefore, one could argue that the use of "person" and "organization" in the same clause of West Bend's policy is ambiguous because both words could refer to a business. *See Danbeck*, 245 Wis. 2d 186, ¶ 10; *Folkman*, 264 Wis. 2d 617, ¶ 17. We must consequently reject West Bend's argument and construe the policy in favor of coverage. *See id.*

> *(b) The complaint alleges a violation of privacy under the policy.*

¶ 17. West Bend next argues that the complaint does not allege a privacy violation under the policy's "personal and advertising injury" provision. According to West Bend, the complaint alleges that the unsolicited fax interfered with A-1 Security's right to be left alone; in other words, the fax violated the business's right to seclusion. West Bend argues that the policy does not provide coverage for such a violation because neither

the right to or violation of seclusion nor the word "seclusion" is found in the policy. West Bend further argues that nothing in the content of the fax violated A-1 Security's right to privacy. According to West Bend, the mere sending of the fax, which arguably did violate A-1 Security's right to seclusion under the TCPA, is unrelated to the content of the advertisement.

¶ 18. In support of its arguments, West Bend relies heavily on *Auto-Owners Insurance Co. v. Websolv Computing, Inc.*, 580 F.3d 543, 551 (7th Cir. 2009), which held that a policy provision similar to the one at issue here did not provide coverage for an alleged privacy violation because it only covered violations of the right to secrecy, as opposed to the alleged right of seclusion. *Websolv* recognized that the "right of privacy" was, as in the case before us, not defined by the policy, and that it could have multiple meanings, such as those involving either secrecy interests or those involving seclusion interests. *See id.* at 549. Nevertheless, it concluded that the use of the word "publication" in the policy narrowed the scope of covered privacy rights to only secrecy rights because one can violate another's right to be left alone without publicizing anything. *See id.* at 550–51. The *Websolv* court further explained that, when looking at the other subsections within the definition of advertising injury, the provisions focused on the harm arising from the content of the advertisement rather than the mere receipt of the advertisement. *Id.* at 551. We disagree with these views.

¶ 19. First, we disagree with *Websolv*'s operating premise that publication is implicated only where the relevant concern is a secret which is published simply because "one can violate another's right to seclusion without publicizing anything." *See id.* at 550. This proposition supposes that the act of publication is

completely divorced from the manner in which the information is communicated. *See id.* at 550–51. But this is nonsensical in the context of the provision at issue here, which provides coverage for injuries arising out of "oral or written publication, in any manner, of material that violates a person's right of privacy." In this context, "publication" is used as a verb; it *is* the manner by which the violative material is transmitted. Furthermore, "publication" is not defined in West Bend's policy. To discern "what a reasonable person in the position of the insured would have understood the words to mean," *Sprangers*, 182 Wis. 2d at 536, words are given their common and ordinary meaning, *Folkman*, 264 Wis. 2d 617, ¶ 17. WEBSTER'S NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE 1836 includes in its definition of "publication" "communication (as of news or information) to the public," and BLACK'S LAW DICTIONARY 1264 includes in its definition of "publication" "[g]enerally, the act of declaring or announcing to the public" and "[t]he offering or distribution of copies of a work to the public." This supports our view—publicizing does in fact refer to an act. *See also Cynosure, Inc. v. St. Paul Fire and Marine Ins. Co.*, 645 F.3d 1, 4 (1st Cir. 2011) (explaining that " 'publishing' " can "refer to revealing information or merely to the act itself of conveying material considered apart from its content") (citation omitted).

¶ 20. Second, we disagree with *Websolv*'s conclusion that the provision at issue covers only secrecy interests because "[t]he other . . . provisions of the advertising-injury definition focus on harm arising from the *content* of an advertisement rather than harm arising from mere *receipt* of an advertisement." *See id.*, 580 F.3d at 551. The definition of "personal and advertising injury" includes seven separate and distinct sce-

728

narios, ranging from false arrest to copyright infringement. Even if one of these scenarios did implicate solely a secrecy interest, it would defy the principles of contract construction to require that they *all* did so.

¶ 21. Instead, our view is more consistent with *Valley Forge Insurance Co. v. Swiderski Electronics, Inc.*, 860 N.E.2d 307 (Ill. 2006), in which the Illinois Supreme Court held that the word "publication" in a similar policy provision does not narrow the scope of "privacy rights" to only those related to secrecy. *Id.* at 317–18. As we do in Wisconsin, the *Valley Forge* court looked to the words' dictionary definitions to determine their "plain, ordinary, and popular meanings." *See id.* at 316–17; *see also, e.g., Folkman*, 264 Wis. 2d 617, ¶ 17; *Sprangers*, 182 Wis. 2d at 536. *Valley Forge* explained that BLACK's LAW DICTIONARY and WEBSTER's THIRD NEW INTERNATIONAL DICTIONARY both confirm that the "right of privacy" includes both seclusion and secrecy interests, and held that the policy language therefore can reasonably be understood to refer to violations of a person's right to seclusion. *Valley Forge*, 860 N.E.2d at 317. The court held that the "material" violated this right because the advertisements were sent without permission. *Id.* Furthermore, the *Valley Forge* court refused, as we do today, to read additional provisions into the policy:

> To adopt the insurers' proposed interpretation of it—i.e., that it is only applicable where the content of the published material reveals private information about a person that violates the person's right of privacy—would essentially require us to rewrite the phrase "material that violates a person's right of privacy" to read "material the content of which violates a person other than the recipient's right of privacy." This we will not do.

729

*See id.* at 317–18 (emphasis omitted). We find the court's reasoning especially persuasive because the principles followed in *Valley Forge* are consistent with those we follow in Wisconsin. *See id.*; *see also, e.g., Folkman*, 264 Wis. 2d 617, ¶ 17; *Sprangers*, 182 Wis. 2d at 536.

¶ 22. In sum, we conclude that by faxing advertisements to Sawyer and the alleged class of recipients, Atlas's advertisement transmitted printed material and communicated information to the public; therefore, it was a "publication." The "material" at issue is an unsolicited fax advertisement, which is expressly prohibited by the TCPA. *See* 47 U.S.C. § 227(b)(1)(C) (referring to unsolicited advertisements). That material, by virtue of its prohibited nature, violated Sawyer's right to be left alone—*i.e.,* his right to seclusion. While the Dissent claims that "it stretches the concept of privacy beyond the breaking point to even suggest that the single facsimile Sawyer received was the type of 'material' . . . that 'would be highly offensive to a reasonable person,' " *see* Dissent, ¶ 8 (citing the RESTATEMENT (SECOND) OF TORTS § 652B), we disagree, and conclude that the unsolicited advertisement *was* highly offensive, again, as evinced by the fact that it is expressly prohibited by the TCPA. Moreover, we are not persuaded by the Dissent's contention that Congress intended for us to construe unsolicited telephone calls, but not unsolicited fax advertisements, as invasions of privacy. This is because, regarding both unsolicited telephone calls and fax solicitations: (1) the substance of what is prohibited is the same—unwanted solicitations; and (2) the nature of the right being disregarded is the same—the receiver's right to be left alone. *See, e.g.,* 47 U.S.C. § 227(b)(1)(B) & § 227(b)(2)(B) (prohibiting unsolicited

730

telephone calls, including calls involving unsolicited advertisements); § 227(b)(1)(C) (prohibiting unsolicited fax advertisements). For these same reasons, we are not persuaded by the Dissent's corollary argument that a telephone call constitutes a "greater annoyance," and therefore implicates the receiver's right to privacy, while an unsolicited fax advertisement, which also makes use of telephone technology, does not do so. We agree with Sawyer that Atlas's unsolicited fax did in fact violate his right to be left alone and conclude that the policy does provide coverage.

*(c) The unsolicited blast fax constitutes a "publication" under the policy.*

¶ 23. West Bend also argues that the fax at issue was not a "publication" under the policy; however, for the reasons explained above, we conclude that the fax was in fact a publication. We further note that while West Bend contends in its brief that the word "publication" should be equated with the word "publicity," and therefore should reasonably be interpreted to mean communication to the public at large, *see Pachowitz v. LeDoux*, 2003 WI App 120, ¶ 18, 265 Wis. 2d 631, 666 N.W.2d 88, in *Pachowitz*, the word was used in the context of a cause of action for an invasion of privacy under WIS. STAT. § 895.50, *see Pachowitz*, 265 Wis. 2d 631, ¶ 18 (" 'Publicity,' for purposes of § 895.50, has been defined to mean that 'the matter is made public, by communicating it to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge.' ") (citation omitted). Because the complaint does not allege the tort of invasion of privacy, this interpretation is not reasonable, and we must reject this argument.

731

### (2) The "knowing violation of rights of another" exclusion does not apply.

¶ 24. In the alternative, West Bend argues in its brief that even if there is coverage under the personal and advertising injury provision, it is excluded under the policy's "Knowing Violation of Rights of Another" exclusion. According to West Bend, because the act of sending a fax is purposeful, Atlas must have intended that A-1 Security receive the advertisement via fax. The complaint does not allege that Atlas accidentally sent the fax; rather, it must have known it was sending the fax in violation of the law and intended that it be received. *See Putnam v. Time Warner Cable of Se. Wis., Ltd. P'ship*, 2002 WI 108, ¶ 13 n.4, 225 Wis. 2d 447, 649 N.W.2d 626 ("The mistake of law doctrine states that every person is presumed to know the law and cannot claim ignorance of the law as a defense.").

¶ 25. We disagree. Even if Atlas "knowingly" violated Sawyer's rights under the TCPA, the complaint allows for the possibility that Atlas was negligent in causing a "personal and advertising injury" under the policy. The complaint alleges that Atlas "knew or should have known" that it was not given express invitation or permission to fax an advertisement to Sawyer and other class members and that it did not have an established relationship with Sawyer and the other class members. Because the complaint allows for a scenario in which Atlas was negligent in knowing that the act would inflict "personal and advertising injury," coverage is fairly debatable, and we conclude that the exclusion does not apply. *See American Family Mut. Ins. Co. v. American Girl, Inc.*, 2004 WI 2, ¶ 24, 268 Wis. 2d 16, 673 N.W.2d 65 (exclusions construed narrowly against the insurer).

*By the Court.*—Judgment affirmed.

732

¶ 26. FINE, J. (*dissenting*). As the Majority tells us, the Telephone Consumer Protection Act, 47 U.S.C. § 227, makes it "unlawful . . . to use any telephone facsimile machine, computer, or other device to send, to a telephone facsimile machine, an unsolicited advertisement," with exceptions not material in this case. 42 U.S.C. § 227(b)(1)(C). The potential penalties are withering:

### Private right of action

A person or entity may, if otherwise permitted by the laws or rules of court of a State, bring in an appropriate court of that State—

(A) an action based on a violation of this subsection or the regulations prescribed under this subsection to enjoin such violation,

(B) an action to recover for actual monetary loss from such a violation, or to receive $500 in damages for each such violation, whichever is greater, or

(C) both such actions.

If the court finds that the defendant willfully or knowingly violated this subsection or the regulations prescribed under this subsection, the court may, in its discretion, increase the amount of the award to an amount equal to not more than 3 times the amount available under subparagraph (B) of this paragraph.

47 U.S.C. § 227(b)(3). These penalties are an irresistible lure for the class-action lawsuit, which multiplies geometrically the potential liability of anyone who sends an unsolicited facsimile that violates the Act. As *Creative Montessori Learning Centers v. Ashford Gear LLC*, 662 F.3d 913, 914–915 (7th Cir. 2011) (junk faxes), tells us: "Certification as a class action can 'coerce the

733

defendant into settling on highly disadvantageous terms, regardless of the merits of the suit,' and in this case is 'highly likely to because of the magnitude of the potential damages.' " (quoted sources omitted). The firm criticized by name in *Creative Montessori Learning Centers*, Bock and Hatch, LLC, *id.*, 662 F.3d at 916–917 ("class counsel have demonstrated a lack of integrity that casts serious doubt on their trustworthiness as representatives of the class"), appears, as "of counsel" on Isaac Sawyer's federal court "class action complaint." (Uppercasing omitted.) "Anyway, the statute, with its draconian penalties for multiple faxes, is what it is[,]" *id.*, 662 F.3d at 915, and we are merely called upon to determine whether West Bend Mutual Insurance Company has a duty to defend Atlas Heating and Sheet Metal Works, Inc., in connection with the "draconian penalties" Atlas faces if this class is certified by the federal courts.

¶ 27. An insurance policy is a contract between the insurer and the insured, *Admiral Ins. Co. v. Paper Converting Machine Co.*, 2012 WI 30, ¶ 41, 339 Wis. 2d 291, 308, 811 N.W.2d 351, 360, and is interpreted and applied as are other contracts, *State Farm Mut. Auto. Ins. Co. v. Bailey* 2007 WI 90, ¶ 22, 302 Wis. 2d 409, 420–421, 734 N.W.2d 386, 391. Critically, we give the language of an insurance policy its ordinary meaning— "what the reasonable person in the insured's position would understand it to mean." *Id.*, 2007 WI 90, ¶ 22, 302 Wis. 2d at 421, 734 N.W.2d at 391. Let's look at the "personal and advertising injury" clause in the policy and see how a reasonable insured would read it.

¶ 28. As the Majority tells us, the policy has this undertaking: "We will pay those sums that the insured becomes legally obligated to pay as damages because of 'personal and advertising injury' to which this insur-

734

ance applies." As material here, the policy defines "personal and advertising injury" as "written publication, in any manner, *of material that violates a person's right of privacy.*" (Emphases added.) This definition has three interconnected requirements. There must be:

- A "written publication";

- The "written publication" must be of "material";

- The "*material*" must "violate[] a person's right to privacy."

(Emphasis added.)

¶ 29. I agree with the Majority that sending a facsimile, whether wanted by the recipient or not wanted is "publication." But, under the policy the "material" must violate the recipient's "right to privacy" in order to be covered. In my view, the advertisement for sheet-metal work sent by Atlas is not that kind of "material" because it did not violate anyone's right to privacy. Significantly, Sawyer's lawyer conceded at oral argument that it is *not* the *sending* of a facsimile that violates the Act and, in his view, the recipient's "privacy" (although the Majority opinion seems to imply that it is) because he admitted that sending by facsimile a blank sheet of paper or even pictures of his family would not violate the recipient's privacy even though, of course, sending a blank sheet of paper uses the recipient's paper, and sending pictures of his family would not only use the recipient's paper but also a significant amount of ink. Simply put, the Act does not make unlawful all unwanted facsimiles, the facsimile must be an "unsolicited *advertisement.*" 47 U.S.C. § 227(b)(1)(C) (emphasis added). This means, of course, that if the *transmission itself* is not an invasion of privacy so as to violate the statute (as Sawyer's lawyer conceded at oral argument),

the *nature* of the advertisement must be an invasion of "privacy." Again, as I further explain below, there is *nothing* in the advertisement that violated Sawyer's (or anyone's) right to privacy. I now turn to: (A) further consideration of the Act; (B) the right-to-privacy concept in our law; and (C) the policy and what Atlas bought by paying its liability-coverage premiums.

A. *The Act.*

¶ 30. As noted, Atlas faxed to Sawyer a one-page advertisement for sheet-metal work. That was unlawful under the Act. There is nothing in the Act, however, that characterizes the receipt of an unwanted advertising facsimile as an invasion of *privacy.* Indeed, the Act also makes unlawful the making of unsolicited telemarketing telephone calls (with exceptions not material to our discussion) and explicitly uses the word "privacy" in connection with those telephone calls; it does not used the word "privacy" in connection with the sending of unwanted advertising facsimiles. *See* 47 U.S.C. §§ 227(b)(2) & (c), the pertinent parts of which are in the footnote.[1] I have italicized the phrase "privacy rights" wherever it appears.

---

[1] Section 227(b)(2) provides:

The [Federal Communications] Commission shall prescribe regulations to implement the requirements of this subsection. In implementing the requirements of this subsection, the Commission—

(A) shall consider prescribing regulations to allow businesses to avoid receiving calls made using an artificial or prerecorded voice to which they have not given their prior express consent;

(B) may, by rule or order, exempt from the requirements of paragraph (1)(B) of this subsection, subject to such conditions as the Commission may prescribe—

(i) calls that are not made for a commercial purpose; and

(ii) such classes or categories of calls made for commercial purposes as the Commission determines—

(I) will not adversely affect the *privacy rights* that this section is intended to protect; and

(II) do not include the transmission of any unsolicited advertisement;

(C) may, by rule or order, exempt from the requirements of paragraph (1)(A)(iii) of this subsection calls to a telephone number assigned to a cellular telephone service that are not charged to the called party, subject to such conditions as the Commission may prescribe as necessary in the interest of the *privacy rights* this section is intended to protect;

Section 227(c) provides:

**(1) Rulemaking proceeding required**

Within 120 days after December 20, 1991, the Commission shall initiate a rulemaking proceeding concerning the need to protect residential telephone subscribers' *privacy rights* to avoid receiving telephone solicitations to which they object. The proceeding shall—

(A) compare and evaluate alternative methods and procedures (including the use of electronic databases, telephone network technologies, special directory markings, industry-based or company-specific "do not call" systems, and any other alternatives, individually or in combination) for their effectiveness in protecting such *privacy rights,* and in terms of their cost and other advantages and disadvantages;

. . .

**(2) Regulations**

Not later than 9 months after December 20, 1991, the Commission shall conclude the rulemaking proceeding

737

the Act, not the transmission of advertising facsimiles, and it recognized the distinction between the two.

- "The term 'telephone facsimile machine' means equipment which has the capacity (A) to transcribe text or images, or both, from paper into an electronic signal and to transmit that signal over a regular telephone line, or (B) to transcribe text or images (or both) from an electronic signal received over a regular telephone line onto paper. 47 U.S.C. § 227(a)(3).

- In contrast, and as material: "The term 'telephone solicitation' means the initiation of a telephone call

> initiated under paragraph (1) and shall prescribe regulations to implement methods and procedures for protecting the *privacy rights* described in such paragraph in an efficient, effective, and economic manner and without the imposition of any additional charge to telephone subscribers.
>
> **(3) Use of database permitted**
>
> The regulations required by paragraph (2) may require the establishment and operation of a single national database to compile a list of telephone numbers of residential subscribers who object to receiving telephone solicitations, and to make that compiled list and parts thereof available for purchase. If the Commission determines to require such a database, such regulations shall—
>
> . . .
>
> **(K)** prohibit the use of such database for any purpose other than compliance with the requirements of this section and any such State law and specify methods for protection of the *privacy rights* of persons whose numbers are included in such database; and
>
> **(L)** require each common carrier providing services to any person for the purpose of making telephone solicitations to notify such person of the requirements of this section and the regulations thereunder.

738

or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person[.]" 47 U.S.C. § 227(a)(4).

- Further, the Act recognizes that advertisement can be both oral (over the telephone) and written (by facsimile): "The term 'unsolicited advertisement' means any material advertising the commercial availability or quality of any property, goods, or services which is transmitted to any person without that person's prior express invitation or permission, *in writing or otherwise.*" 47 U.S.C. § 227(a)(5) (emphasis added).

Indeed, the Congressional findings reveal specifically that Congress's "privacy rights" concern was in connection with *telephone telemarketing,* as is evidenced by the findings in the footnote.[2] Again, I have italicized the

---

[2] " 'The Congress finds that:

(1) The use of the telephone to market goods and services to the home and other businesses is now pervasive due to the increased use of cost-effective telemarketing techniques.

(2) Over 30,000 businesses actively telemarket goods and services to business and residential customers.

(3) More than 300,000 solicitors call more than 18,000,000 Americans every day.

(4) Total United States sales generated through telemarketing amounted to $435,000,000,000 in 1990, a more than four-fold increase since 1984.

(5) Unrestricted telemarketing, however, can be an intrusive invasion of privacy and, when an emergency or medical assistance telephone line is seized, a risk to public safety.

(6) Many customers are outraged over the proliferation of intrusive, nuisance calls to their homes from telemarketers.

(7) Over half the States now have statutes restricting various uses of the telephone for marketing, but telemarketers can evade their prohibitions through interstate operation; therefore, Federal law is needed to control residential telemarketing practices.

(8) The Constitution does not prohibit restrictions on commercial telemarketing solicitations.

(9) Individuals' privacy rights, public safety interests, and commercial freedoms of speech and trade must be balanced in a way that protects the privacy of individuals and permits legitimate telemarketing practices.

(10) Evidence compiled by the Congress indicates that residential telephone subscribers consider automated or prerecorded telephone calls, regardless of the content or the initiator of the message, to be a nuisance and an invasion of privacy.

(11) Technologies that might allow consumers to avoid receiving such calls are not universally available, are costly, are unlikely to be enforced, or place an inordinate burden on the consumer.

(12) Banning such automated or prerecorded telephone calls to the home, except when the receiving party consents to receiving the call or when such calls are necessary in an emergency situation affecting the health and safety of the consumer, is the only effective means of protecting telephone consumers from this nuisance and privacy invasion.

(13) While the evidence presented to the Congress indicates that automated or prerecorded calls are a nuisance and an invasion of privacy, regardless of the type of call, the Federal Communications Commission should have the flexibility to design different rules for those types of automated or prerecorded calls that it finds are not considered a nuisance or invasion of privacy, or for noncommercial calls, consistent with the free speech protections embodied in the First Amendment of the Constitution.

(14) Businesses also have complained to the Congress and the Federal Communications Commission that automated or prerecorded telephone calls are a nuisance, are an invasion of privacy, and interfere with interstate commerce.

(15) The Federal Communications Commission should consider adopting reasonable restrictions on automated or prerecorded calls to businesses as well as to the home, consistent with the constitutional protections of free speech.' "

Telephone Consumer Protection Act of 1991, Pub.L. No. 102–243, § 2 (Emphasis added.)

211220) on the Act distinguished between the privacy interests invaded by telephone telemarketers on the one hand, and the annoyance and expense caused by unsolicited facsimile transmissions: "The purposes of the bill are to protect the *privacy interests of residential telephone subscribers by placing restrictions on unsolicited, automated telephone calls to the home and to facilitate interstate commerce by restricting certain uses of facsimile (tax)[sic] machines and automatic dialers.*" (Emphases added).

¶ 32. We ignore the deference we owe to legislative enactments if we import a "privacy" component into the Act's facsimile provisions when Congress, recognizing the greater annoyance of an unwanted telephone telemarketing calls, used the word "privacy" only in provisions dealing with those intrusions. Significantly, 47 U.S.C. "§ 227(b)(1)(C) condemns only a *particular means of communicating* an advertisement, *rather than the contents of that advertisement*—while an advertising-injury coverage deals with informational content." *American States Ins. Co. v. Capital Associates of Jackson County, Inc.* 392 F.3d 939, 940, 943 (7th Cir. 2004) (Advertising-injury clause, "publication of material that violates a person's right of privacy[,]" "does not cover the normal consequences of junk advertising faxes.") (emphasis added) (The West Bend policy clause is a clone of the policy clause in *American States.*). This is further evident when we examine the law's concept of "privacy," to which I now turn.

B. *Privacy.*

¶ 33. The concept of invasion of privacy has accepted contours in the law. Thus, the Restatement of Torts tells us:

741

The right of privacy is invaded by

(a) unreasonable intrusion upon the seclusion of another, as stated in § 652B; or

(b) appropriation of the other's name or likeness, as stated in § 652C; or

(c) unreasonable publicity given to the other's private life, as stated in § 652D; or

(d) publicity that unreasonably places the other in a false light before the public, as stated in § 652E.

RESTATEMENT (SECOND) TORTS § 652A(2). Subparts (b), (c), and (d) are clearly not applicable. The only possible lever for Sawyer is subpart (a). But the "seclusion" encompassed by that black-letter rule does not apply here, as the referenced section tells us: "One who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, is subject to liability to the other for invasion of his privacy, *if the intrusion would be highly offensive to a reasonable person.*" RESTATEMENT (SECOND) TORTS § 652B (emphasis added). Sawyer may not have liked getting the facsimile, and his lawyers are hoping to find many more who want to get their statutory penalty, but it stretches the concept of privacy beyond the breaking point to even suggest that the single facsimile Sawyer received was the type of "material" (in the word of the West Bend insurance policy) that "would be highly offensive to a reasonable person." The Restatement comment that is closest to the unwanted-facsimile situation is:

There is likewise no liability unless the interference with the plaintiff's seclusion *is a substantial one,* of a kind that would be highly offensive to the ordinary reasonable man, as the result of conduct to which the

reasonable man would strongly object. *Thus there is no liability for knocking at the plaintiff's door, or calling him to the telephone on one occasion or even two or three, to demand payment of a debt.* It is only when the telephone calls are repeated with such persistence and frequency as to amount to a course of hounding the plaintiff, that becomes a substantial burden to his existence, that his privacy is invaded.

RESTATEMENT (SECOND) TORTS § 652B, cmt. *d.* (Emphasis added.)

¶ 34. Further, Wisconsin's legislature has defined "privacy" for us in WIS. STAT. § 995.50(2) in a way that is consistent with the RESTATEMENT:

In this section, "invasion of privacy" means any of the following:

(a) Intrusion upon the privacy of another *of a nature highly offensive to a reasonable person,* in a place that a reasonable person would consider private or in a manner which is actionable for trespass.

(b) The use, for advertising purposes or for purposes of trade, of the name, portrait or picture of any living person, without having first obtained the written consent of the person or, if the person is a minor, of his or her parent or guardian.

(c) Publicity given to a matter concerning the private life of another, of a kind highly offensive to a reasonable person, if the defendant has acted either unreasonably or recklessly as to whether there was a legitimate public interest in the matter involved, or with actual knowledge that none existed. It is not an invasion of privacy to communicate any information available to the public as a matter of public record.

(d) Conduct that is prohibited under s. 942.09, regardless of whether there has been a criminal action

743

related to the conduct, and regardless of the outcome of the criminal action, if there has been a criminal action related to the conduct.

(Emphasis added.) The only possible applicable subsection is (a), and "[t]he test is an objective one: whether a reasonable person would find the intrusion highly offensive." *Gillund v. Meridian Mut. Ins. Co.*, 2010 WI App 4, ¶ 29, 323 Wis. 2d 1, 20, 778 N.W.2d 662, 672 (Ct. App. 2009). Thus, it does not matter how Sawyer viewed the Atlas facsimile if a "reasonable person" would not find it "highly offensive." Significantly, Sawyer does not tell us *why* he finds (if he does) the one-page sheet-metal advertisement to be "highly offensive," no less why a reasonable person would. Nevertheless, the Majority concludes, as a matter of law, "that the unsolicited advertisement was highly offensive." Majority, ¶ 22.

¶ 35. What the Majority's as-a-matter-of-law holding means, is that *every* piece of junk mail, advertising material slipped under an apartment door, or placed in a mail/paper box, or attached to the homeowner's door knob, or, slipped under a car's windshield-wiper blade (perhaps the most annoying unsolicited advertisements) will fall within WIS. STAT. § 995.50(2)(a)'s proscription because the advertisement would be: (1) a trespass and (2), under the Majority's analysis, "highly offensive" as a matter of law. This will be another boon to creative class-action lawyers because § 995.50(1) permits not only, under subsection (b), "[c]ompensatory damages based either on plaintiff's loss or defendant's unjust enrichment," but also, under subsection (c), "[a] reasonable amount for attorney fees."

¶ 36. Again, in my view of the law, the Atlas facsimile may have violated the Act, but the advertisement was hardly "highly offensive" and certainly was

not "material that violate[d] a person's right of privacy," as required by the insurance policy for there to be coverage.

C. *The policy's grant of liability coverage.*

¶ 37. I now turn to the policy and whether a reasonable insured would understand the policy's liability coverage to encompass a single transmission advertising facsimile similar to the one Atlas sent to Sawyer.

¶ 38. Courts recognize that in assessing what reasonable persons might expect from what they hear or read, "the meaning of a word depends on *what it denotes to members of the appropriate linguistic community,* not on idiosyncratic usages that people may be able to devise." *Blue Cross Blue Shield of Massachusetts, Inc. v. BCS Ins. Co.*, 671 F.3d 635, 638 (7th Cir. 2011) (emphasis added). *See also Taniguchi v. Kan Pacific Saipan, Ltd.*, 566 U.S. ___, ___, 132 S. Ct. 1997, 1998 (May 21, 2012) (An undefined word "must be given its ordinary meaning."). The "appropriate linguistic community" here is the reasonable insured.

¶ 39. In assessing what a reasonable insured would expect his or her insurance policy to cover, the premium paid is a valuable guide because reasonable insureds recognize that premiums are a function of potential liability. Thus, a reasonable insured would willingly pay more to get automobile-damage coverage on a pristine and low-mileage vintage Rolls Royce than he or she would on a twenty-year old battered and rusted clunker with more than two-hundred thousand miles on the odometer. By the same token, no insurance company would insure the Rolls Royce in my example for the premium it would charge to insure the clunker. The law in Wisconsin can hardly be more plain: "[W]e do not interpret insurance policies to provide coverage

745

for risks that the insurer did not contemplate or under-write and for which it has not received a premium." *American Family Mut. Ins. Co. v. American Girl, Inc.*, 2004 WI 2, ¶ 23, 268 Wis. 2d 16, 32, 673 N.W.2d 65, 73. *See also Maxwell v. Hartford Union High School District*, 2012 WI 58, ¶ 34, 341 Wis. 2d 238, 255, 814 N.W.2d 484, 492 ("A contract of insurance should not be rewrit-ten to bind the insurer to *a risk it did not contemplate and for which it has not been paid.*") (emphasis added).

¶ 40. As we have seen, the Act subjects someone who sends an unsolicited facsimile advertisement to a minimum liability of $500 per facsimile, which the court has the power to triple to $1,500 per facsimile. That is the liability Sawyer seeks to impose on West Bend. If he gets class-action certification, the potential liability is unbounded—the well is deep and the bucket is huge. But Atlas only paid $1,362 for its liability coverage. Imposing coverage here violates the touchstone teaching of *American Girl* because the actuarial assessment of a proper premium for "advertising injury" liability coverage could not have envisioned that a facsimile like the one here could possibly trigger insurance coverage for a violation of the Act with its draconian penalties.

¶ 41. As much as Sawyer and his class-action law-yers would like to have a deep pocket for the reasons expressed by *Creative Montessori Learning* we quoted earlier, insurance premiums must cover insurance-company costs and give the company a reasonable return —money paid out that is wholly out of proportion to the premiums must come from someone—other policy hold-ers. Simply put, "insurance companies are not eleemosy-nary endeavors." *Bruchert v. Tokio Marine & Nichido Fire Ins. Co., Ltd.*, 2007 WI App 156, ¶ 12, 303 Wis. 2d

671, 678, 736 N.W.2d 234, 238. Moreover, Sawyer and his class-action lawyers are hardly suitable beneficiaries of charity in this case.

¶ 42. I respectfully dissent and would reverse.